Michael Wayne JENNINGS,
Petitioner–Appellant,

v.

Jeanne WOODFORD, Warden of the California State Prison at San Quentin, Respondent–Appellee.

No. 00–99008.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 25, 2001.

Filed May 10, 2002.

Gilbert Eisenberg and Marianne D. Bachers, San Francisco, CA, for the petitioner–appellant.

John Deist, California Attorney General, San Francisco, CA, for the respondent–appellee.

Before B. FLETCHER, T.G. NELSON, and BERZON, Circuit Judges.

## OPINION

BETTY B. FLETCHER, Circuit Judge.

In February 1984, a jury in Contra Costa County, California, convicted Michael Wayne Jennings of first degree murder, forcible rape, first degree burglary, and robbery. After finding that Mr. Jennings had intentionally committed the murder during the commission of the rape, burglary, and robbery—a special circumstance permitting capital punishment—the jury voted to impose the death penalty. Mr.

Jennings appeals the district court's denial of his petition for a writ of habeas corpus. He seeks reversal of both his sentence and his conviction.

Mr. Jennings claims his trial counsel was unreasonably and prejudicially ineffective under the standard set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), by failing to investigate or present mental health defenses in either the guilt or penalty phases of his capital trial. He further argues that his trial counsel was constitutionally ineffective because of multiple conflicts of interest. Because the State provides no basis upon which to conclude that a reasonable tactical decision motivated trial counsel's abject failure to discover and consider vast and easily obtainable information about Mr. Jennings' fragile and failing mental health—information that would have made a non-first degree conviction reasonably probable—we find that Mr. Jennings was deprived of the effective assistance of counsel guaranteed by the Sixth Amendment during the guilt phase of his trial. Because we reverse based on guilt phase ineffectiveness, we need not reach questions about counsel's conflicts of interest or incompetence during the penalty phase. We reverse both Mr. Jennings' death sentence and his conviction and remand with instructions to grant the writ unless the state decides to retry Mr. Jennings.

## FACTUAL BACKGROUND

### I. Violet Newman's Murder

Sixty-three-year-old Violet Newman died on August 7, 1982 after withstanding multiple traumatic injuries during a rape and apparent robbery. Among other gruesome injuries, Ms. Newman suffered fourteen stab wounds to the chest and abdomen, a severed carotid artery and jugular vein, bruising and abrasions consistent with rape, and ligature marks suggesting she was bound with rope by her neck and ankles.

Substantial circumstantial evidence connected Michael Wayne Jennings to the crime. Specific evidence underlying the prosecution's guilt case included the following: [1]

- Mr. Jennings had known the victim for much of his life, having lived next door to her at his parents' home and grown up with her children.

- Strapping tape found in Ms. Newman's home bearing Mr. Jennings' thumb and palm prints matched tape found in his pickup truck.

- The truck also contained rope identical to some found near the victim and appeared to match ligature marks on her neck and ankles.

- Police found a piece of Ms. Newman's answering machine and blood matching hers in Mr. Jennings' truck.

- Mr. Jennings, a secretor,[2] had had a successful vasectomy several years before the murder. Aspermatic semen containing antigens consistent with his blood was found on the victim.

- Someone made a phone call from the victim's home at 2:19 a.m. to a Ms. Joanne Boechne, a friend and former girlfriend of Mr. Jennings unknown to the victim. Mr. Jennings had tried to reach Ms. Boechne earlier in the evening.

- Several hours after the murder, a wet Mr. Jennings reported to friends that

---

1. *See People v. Jennings,* 46 Cal.3d 963, 251 Cal.Rptr. 278, 760 P.2d 475 (1988).

2. "[A]n individual of blood group A, B, or AB who secretes the antigens characteristic of

these blood groups in bodily fluids (as saliva)" MERRIAM-WEBSTER ONLINE· COLLEGIATE DICTIONARY. (2002). *http://www.merriam-webster.com/dictionary.htm* (Apr. 25, 2002).

he had taken a whirlpool bath. Ms. Newman owned a whirlpool tub.

- On the night of the murder, Mr. Jennings lost a knife whose blade length was consistent with the victim's stab wounds.
- Mr. Jennings volunteered facts about the crime that had not been publicly released to both police and friends.

### II. Investigation & Trial

On the night of the murder, petitioner attended a bachelor party at which he took methamphetamine and consumed alcohol. Numerous sources noted that he was an habitual, heavy methamphetamine user. Although no witness could testify that Mr. Jennings had been at the party all night, his trial counsel relied primarily on an alibi defense as well as suggestions of an alternate perpetrator. In a surprise blow to the defense that came to light only at trial, a mix-up regarding daylight savings time prevented the defense from being able to establish an alibi for Mr. Jennings at the time the call to Ms. Boechne was placed from the victim's home.

Apart from acknowledging Mr. Jennings' drug use on the night of the crime, Petitioner's trial counsel, Michael Oliver, did not present any evidence during the guilt phase about his client's mental health despite considerable evidence—detailed below—suggesting that drug use and underlying mental problems contributed to Mr. Jennings' actions and mental state.

### III. Jury Verdict & Subsequent History

The jury deliberated from the afternoon of February 7, 1984 to the afternoon of February 9, 1984 before finding petitioner guilty on all counts. The penalty phase testimony and argument ended on February 27, 1984; the jury began deliberations that afternoon and returned a death penalty verdict the following morning. The California Supreme Court upheld the judgment. *People v. Jennings*, 46 Cal.3d 963, 251 Cal.Rptr. 278, 760 P.2d 475 (1988). The U.S. Supreme Court denied certiorari. *Jennings v. California*, 489 U.S. 1091, 109 S.Ct. 1559, 103 L.Ed.2d 862 (1989).

After the California Supreme Court denied his state habeas corpus petition, Mr. Jennings petitioned for habeas corpus relief in the U.S. District Court for the Northern District of California.

Respondent moved for summary judgment on April 29, 1994. Petitioner subsequently moved for summary judgment on his conflict of interest claim. On May 5, 1998, the district court issued a decision denying Mr. Jennings' Motion for Summary Judgment on the conflict claim and granting summary judgment to Respondent on all but three claims. The district court granted an evidentiary hearing on the three remaining claims, through which petitioner alleged: (1) he received ineffective assistance of counsel at the guilt and penalty phases; (2) he was not competent to aid and assist counsel at trial; and (3) he was impermissibly shackled at trial. We discuss facts adduced at the evidentiary hearing with respect to Mr. Jennings' ineffective assistance of counsel claim in detail below.

Following a ten-day evidentiary hearing, Judge Ingram issued an Order and Judgment denying Mr. Jennings habeas relief. Petitioner timely filed a Notice of Appeal. The district court issued a certificate of probable cause on the same day. The issues remaining on appeal are Mr. Jennings' claims that he received ineffective assistance of counsel at both the guilt and penalty phases of his trial because of (1) trial counsel's failure to adequately investigate and present information about mental health, drug abuse, and family background at both the guilt and penalty phases of petitioner's trial and (2) trial counsel's numerous conflicts.

## JURISDICTION

Because Mr. Jennings filed his notice of appeal after the effective date of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), appellate procedures created under AEDPA govern. *Slack v. McDaniel*, 529 U.S. 473, 478, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Pursuant to 28 U.S.C. § 2253(c)(1), a generalized Certificate of Probable Cause (CPC) like that issued by the district court in this case is no longer sufficient to confer jurisdiction on this court. Instead, Fed. R.App. P. 22(b) authorizes us to issue a Certificate of Appealability (COA) 6847 with respect to particular issues. *Silva v. Woodford*, 279 F.3d 825, 832 (9th Cir.2002). A COA in turn gives us jurisdiction over the merits in accordance with 28 U.S.C. §§ 2253 and 2254.

Pursuant to Fed. R.App. P. 22(b)(2) we treat petitioner's appeal from the district court's ruling as an application for a COA. *Schell v. Witek*, 218 F.3d 1017, 1021 n. 4 (9th Cir.2000) (en banc). We may issue a COA for any issue with respect to which petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

■ The Supreme Court recognized in *Slack v. McDaniel* that the "substantial showing" standard for a COA is relatively low and is the same as the prior standard for issuance of a CPC apart from the requirement that the court identify specific appealable issues. *Slack*, 529 U.S. at 483, 120 S.Ct. 1595. This standard, articulated in *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), permits appeal where petitioner can "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [differently]; or that the questions are adequate to deserve encouragement to proceed further." *Id.* at n. 4 (internal quotation marks and citations omitted). The *Barefoot* court noted that

"in a capital case, the nature of the penalty is a proper consideration in determining whether to issue a certificate of [appealability]." *Id.* at 893, 103 S.Ct. 3383. The court must resolve doubts about the propriety of a COA in the petitioner's favor. *Lambright*, 220 F.3d 1022, 1025 (9th Cir. 2000) (en banc).

■ Pursuant to the foregoing standard and "taking a quick look at the underlying merits," *Lambright*, 220 F.3d at 1028, we issue a COA with respect to Mr. Jennings' allegation that his trial counsel failed adequately to investigate and present considerable evidence regarding petitioner's psychological and family history that might have (1) defeated the jury's finding of the requisite intent for first degree murder in the guilt phase or (2) provided sufficient mitigating evidence to warrant a sentence of life rather than death in the penalty phase. If true, these allegations amount to a denial of the constitutional right to the effective assistance of counsel. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding ineffective assistance where counsel, for no plausible strategic purpose, failed to investigate records of child abuse, borderline retardation, and possible brain damage); *Bloom v. Calderon*, 132 F.3d 1267 (9th Cir.1997) (finding ineffectiveness where counsel delegated responsibility for psychiatric investigation to law student, neglected to provide for complete psychiatric examination, and failed to discover family history of mental illness and child abuse). We find that the issues are debatable under the *Barefoot* standard and therefore conclude that a COA is appropriate.

■ We also issue a COA with respect to Mr. Jennings' allegation that he received ineffective assistance of counsel due to his attorney's multiple alleged conflicts of interest. Under *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64

L.Ed.2d 333 (1980), Mr. Jennings may prevail on a Sixth Amendment claim if he demonstrates that (1) defense counsel was actively representing conflicting interests and (2) the conflict had an adverse effect on counsel's performance. Here, Petitioner alleges that trial counsel's partnership with a conflicted attorney and his prior representation of three testifying witnesses—Mr.· Jennings' ex-wife, whom counsel represented in her divorce from Mr. Jennings, Mr. Jennings' former sister-in-law, and a friend with whom Petitioner took drugs—represented active conflicts that adversely affected counsel's performance in a variety of ways. Where representation of different clients is successive, a conflict may arise where cases are "substantially related" or the conflict causes the attorney to "divide[ ] his loyalties." *Thomas v. Municipal Court of the Antelope Valley Judicial District of California,* 878 F.2d 285, 288 (9th Cir.1989). Whether or not Mr. Oliver's multiple representations were sufficiently related to Mr. Jennings' trial to give rise to "active" conflicts is a debatable point upon which reasonable jurists might disagree, and thus the COA threshold test is met.

■ We decline to issue a COA with respect to Mr. Jennings' claim that the district court erred by permitting psychiatrist Dr. James Missett to testify at the evidentiary hearing held as part of that court's habeas proceedings. Even if, as Mr. Jennings alleges, the district court's decision to limit cross-examination regarding Dr. Missett's small claims suits to recoup unpaid client fees was somehow in error, petitioner fails to show how this would amount to a "substantial showing of the denial of a constitutional right," and thus a COA is improper.

3. Apparently trying to hedge his bets despite his failure to present any experts or substan-

## STANDARD OF REVIEW

■ We review a district court's denial of a petition for a writ of habeas corpus de novo. *Smith v. Stewart,* 241 F.3d 1191, 1195 (9th Cir.2001). An ineffective assistance of counsel claim presents a mixed question of law and fact and is reviewed de novo. *Seidel v. Merkle,* 146 F.3d 750, 753 (9th Cir.1998). We review the district court's factual findings for clear error. *Id.*

■ Because Mr. Jennings initiated his appeal prior to AEDPA's 1996 effective date, that Act's more stringent requirements for habeas relief do not apply to our review of the merits in this case. *Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). (As discussed above, AEDPA does govern the requirement that this court issue a COA.)

## DISCUSSION

Petitioner argues that counsel's failure to conduct any investigation into possible mental defenses was unreasonably ineffective and deprived him of his Sixth Amendment right to the effective assistance of counsel at both the guilt and penalty phases of his capital trial. With respect to the guilt phase, respondent counters that counsel, Mr. Oliver, had determined—in part as a result of petitioner's insistence on his innocence—to pursue an alibi defense and thus did not need to investigate potential mental defenses that would be inconsistent with an innocence claim. Petitioner argues that, even if counsel ultimately did not present a mental defense, he was obliged to conduct a reasonable investigation in order to make a well-informed strategic decision not to present such evidence. Mr. Jennings contends that evidence of his severe mental health and drug problems may well have resulted in a second degree murder or manslaughter conviction, obviating the need for a penalty phase and ensuring that petitioner would not be put to death.[3] Because we agree with Mr.

tial testimony beyond an acknowledgment

Jennings, we need not address ineffectiveness arguments addressed to the penalty phase.

## I. Strickland v. Washington and the Duty to Investigate

In *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), the U.S. Supreme Court declared that "the right to counsel is the right to the effective assistance of counsel." Later, in the 1984 case *Strickland v. Washington*, the Court laid out the now familiar yardstick by which the effectiveness of counsel should be measured. In *Strickland*, the Court propounded a two prong test whereby a defendant claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S.Ct. 2052.[4]

Elaborating on the requirements of *Strickland's* first prong—commonly known as the "effectiveness prong"—the *Strickland* Court expressly declined to articulate specific guidelines for attorney performance beyond highly generalized duties, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to advocate the defendant's cause, and the duty to communicate with the client over the course of the prosecution. *Id.* The *Strickland* Court was adamant that defense counsel's duties not be defined so exhaustively as to give rise to a "checklist for judicial evaluation ... [because] [a]ny such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Id.* The court clarified that review of an attorney's performance must be "highly deferential" and must adopt the counsel's perspective at the time of the challenged conduct in order to avoid the "distorting effects of hindsight." *Id.* at 689, 104 S.Ct. 2052. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] the defendant must overcome the presumption that ... the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

Construing the Sixth Amendment to guarantee not effective counsel per se but a fair proceeding with a reliable outcome, the *Strickland* Court concluded that demonstrating that counsel fell below an objective standard of reasonableness alone is insufficient to warrant a finding of ineffective assistance. In addition, in order to satisfy *Strickland's* second prong the defendant must show that the attorney's subpar performance prejudiced the defense. *Id.* at 691–692, 104 S.Ct. 2052. The defendant must affirmatively prove prejudice. The test is whether there is a reasonable probability that, but for the attorney's challenged conduct, the result of the proceeding in question would have been different. The Court defined reasonable

---

that petitioner had used drugs on the night of Ms. Newman's murder, Oliver nonetheless requested and received second degree murder and manslaughter instructions for the jury's consideration.

**4.** *Strickland* itself addressed defendant Washington's claim that his attorney—led in part by a sense of "hopelessness"—rendered ineffective assistance by failing to investigate or present mitigating evidence about the defendant's background, character, and mental state during the sentencing phase of Washington's trial. *Strickland*, 466 U.S. at 673, 104 S.Ct. 2052.

probability as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

■ Applying its test, the *Strickland* Court made clear that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. More recently, the Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), reiterated the requirement that a defense attorney conduct appropriate investigations, finding both ineffectiveness and prejudice where counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." *Id.* at 395, 120 S.Ct. 1495.

■ As our own precedent makes clear, an attorney's failure to investigate may amount to constitutionally deficient performance in either the guilt phase or the penalty phase of a capital case. *See, e.g., Bloom v. Calderon*, 132 F.3d 1267 (9th Cir.1997) (holding counsel was constitutionally ineffective due to failure to obtain psychiatric evidence in a timely fashion and prepare a key psychiatric expert); *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir.2001) (finding constitutionally infirm performance where counsel "failed to adequately investigate, develop, and present mitigating evidence to the jury even though the issue before the jury was whether [the defendant] would live or die.").

## II. Counsel's Guilt Phase Performance

■ Mr. Jennings argues that Michael Oliver rendered constitutionally ineffective representation during the guilt phase of Mr. Jennings' trial by failing to investigate mental health and drug abuse issues that might have raised reasonable doubt about Mr. Jennings' ability to form the requisite intent to justify a first degree murder conviction and, by extension, the possibility of the death penalty. We look first to *Strickland*'s effectiveness prong to determine whether Mr. Oliver's representation was sufficient.

Prior to conflicting out of the case, Mr. Jennings' first attorney, Carol Babington, engaged Dr. Hjortsvang, a psychiatrist, to conduct a preliminary interview with Mr. Jennings. Ms. Babington made it clear in her testimony at the district court's evidentiary hearing that this interview—which lasted only two hours—was meant to be preliminary and was not meant to rule out any potential mental defenses. Instead, it was meant as a preliminary assessment of Mr. Jennings' competency and as a tool to establish a baseline for Mr. Jennings shortly after his arrest.

Mr. Oliver, who claims that Ms. Babington told him that petitioner was "Okay," requested no further investigation and never spoke with Dr. Hjortsvang in person until after the guilt phase of Mr. Jennings' trial.

Nor did he request copies of Mr. Jennings' voluminous medical records.

Nor did he instruct Gail Cates, the paralegal to whom he delegated preparation of the penalty phase, to inquire into possible child abuse in the Jennings family.

Nor did he seek the appointment of additional experts to evaluate Mr. Jennings' mental state or the possible effects of methamphetamine on such a heavy, long-time user, despite the fact that Mr. Oliver knew a syringe had been found in Mr. Jennings' car and that he knew his client had reported to the police that he had been "strung out on goddamn crank for over a year. That's why I was having

such a hard time remembering what the hell I was doing and where."

Nor did he discuss the effects of Mr. Jennings' drug use with his client or others who observed him under the influence of methamphetamine.

Nor did he follow up on the report of Theresa Jennings—Mr. Oliver's former divorce client and Mr. Jennings' former wife—that Mr. Jennings had attempted suicide, that a psychiatrist had told her ex-husband he was schizophrenic, and that she believed he was crazy.[5]

Nor did he investigate an incident—of which he had knowledge—in which a judge ordered Mr. Jennings committed involuntarily for psychiatric evaluation because he appeared catatonic.

Nor did he review stacks of medical records—subpoenaed by the district attorney for review by a special master—save to be certain that his client had, in fact, had a vasectomy.

Nor did he look into Mr. Jennings' teenage commitment to a Boys' Ranch for molesting an eight-year-old and a six-year-old.

Although he admits that his tactics might have been different had he not been mistaken about the time of the call made to Ms. Boechne from Ms. Newman's home—a mistake that destroyed an already weak alibi defense—Mr. Oliver claims he did not conduct any investigation into possible mental defenses because he had settled early on an alibi defense. Although defense counsel is empowered to make such strategic decisions, *Strickland* demands that such decisions be reasonable and informed. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

The district court determined that Mr. Oliver had made a reasonable and informed decision because it concluded that the defense attorney lacked notice that Mr. Jennings had any mental problems and thus had no reason to conduct an investigation. The district court relied on *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir.1995), which held that, where nearly twenty hours of mental health evaluation by defense experts revealed no basis for a mental defense, defense counsel was justified in his decision not to conduct further investigation into the matter.

The district court inaccurately analogized the *Hendricks* fact situation to that of Mr. Jennings. The *Hendricks* court acknowledged what *Strickland* mandates: that attorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices.* In *Hendricks*, the attorney had hired experts who found no evidence of mental disorders after lengthy examination specifically geared toward finding any possible defenses. In the instant case, by contrast, the testimony and declarations of Carol Babington, Dr. Hjortsvang, and even Michael Oliver himself indicate that Dr. Hjortsvang's two hour interview of Mr. Jennings was very preliminary and was not meant to specifically rule out mental defenses; Mr. Oliver ruled out those defenses not because he concluded after reasonable investigation that they were not viable, but because he settled instead on an alibi defense and abandoned all investigation into psychiatric factors.

---

**5.** Mr. Oliver was also privy to another apparent suicide attempt as a result of his representation of Theresa Jennings in her divorce proceedings against Mr. Jennings. In the 1976 divorce, the former Mrs. Jennings alleged that Mr. Jennings had intentionally driven his car into a tree.

The district court went on to distinguish *Turner v. Duncan*, 158 F.3d 449 (9th Cir. 1998) and *Seidel v. Merkle*, 146 F.3d 750 (9th Cir.1998). *Turner* did not deal with failure to investigate mental defenses, but failure to investigate and prepare any defense in a murder case. *Turner*, 158 F.3d at 456. The district court concluded that Jennings' case could not be considered similar because Mr. Oliver's dereliction with respect to the mental defense investigation was not as egregious as Turner's attorney's because Mr. Oliver did have the benefit of a psychiatrist's opinion-based on a two-hour evaluation—that Mr. Jennings was competent to stand trial. The district 6856 court misconstrued the standard *Strickland* imposes. We are not to determine whether it is possible to find a worse attorney, but whether a particular defendant received representation sufficient to satisfy the Sixth Amendment. The fact that there are worse attorneys in the world does not change a bad attorney's lack of diligence into a tactical choice.

Addressing *Seidel v. Merkle*, wherein we found trial counsel ineffective for failing to investigate the defendant's mental state, the district court focused on the fact that counsel in that case was on notice that the defendant had mental problems. *Seidel*, 146 F.3d at 755. The district court found particularly significant the fact that the defense in *Seidel* relied on negating intent. *Id.* at 757. By contrast, the district court found, the defense in Mr. Jennings' case was that the defendant did not commit the homicide at all.

This analysis misses the point. Mr. Oliver was obliged to thoroughly investigate Mr. Jennings' case in order to *determine* whether a mental state defense might have been better than the alibi defense he had "settled on" early. Moreover, the record makes clear that Mr. Oliver was, in fact, on notice about Mr. Jennings' mental health and drug abuse problems.

Mr. Oliver knew, for example, that Mr. Jennings was a long-term methamphetamine addict who had used the drug on the night of the homicide. Mr. Oliver knew his client had told police he had been "strung out" on the drug for over a year. And that he had attempted suicide. And that his ex-wife told police he was "crazy" and had been diagnosed as schizophrenic. And that he had a long history of injuring himself intentionally and pouring liquids in the resulting wounds, thereby causing gangrene. And that he had been involuntarily committed by a judge for psychiatric evaluation. And that he appeared to have been coming off drugs during his videotaped interview with police. And that the newly-minted paralegal Mr. Oliver had hired thought there was something "seriously wrong" with Mr. Jennings. And that friends and co-workers agreed.

Respondents correctly caution that we must consider the prevailing legal norms at the time Mr. Oliver represented Mr. Jennings. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. They point once again to *Hendricks v. Calderon*, where some twenty hours of expert examination revealed no basis for a mental defense. In *Hendricks*, we held that, "[c]ertainly, in 1981, Hendricks' attorneys did not believe they had any duty to investigate Hendricks' social history in the face of the unanimous opinions of their own experts that there was no basis for a mental defense." *Hendricks*, 70 F.3d at 1039. Even if we assume, as the district court concluded, that a correct reading of *Hendricks* would excuse a failure to investigate where an expert had only been called in to evaluate competence and had only met with the defendant for two hours, as was true in Mr. Jennings' case, that case is inapplicable for one simple reason: Mr. Jennings *was not tried in 1981*.

Mr. Jennings was tried in California in 1983. Shortly before Mr. Jennings' trial, the California Supreme Court decided *People v. Mozingo,* 34 Cal.3d 926, 196 Cal. Rptr. 212, 671 P.2d 363 (Cal.1983). The *Mozingo* court adopted a referee's finding that "a possible conflict between a diminished capacity and an alibi defense would not excuse counsel's failure initially to *investigate* the potential strengths of a 'mental defense' vis-a-vis an uncorroborated alibi defense." *Id.* at 367 (emphasis in original). *Mozingo* concluded that counsel's inaction meant he could not have made informed tactical and strategic decisions, and that "counsel's inadequate representation thereby deprived defendant of a potentially meritorious defense or mitigating circumstance." *Id. Mozingo* thus articulated an effectiveness standard for California attorneys.

Not only was *Mozingo* available to Mr. Oliver, we know for a fact that he was aware of the decision. In Mr. Jennings' case, the prosecutor actually brought *Mozingo* to the judge's attention, expressing concern that Mr. Oliver had not properly investigated substantial medical records and that the failure could provide grounds for appeal. Confronted with the concern in open court, Mr. Oliver assured the court that he had discharged his duty—a statement that runs counter to Mr. Oliver's admission that he did not in fact review any of the medical records save those discussing his client's vasectomy.

We find that, even in 1983, the information Mr. Oliver acknowledges he possessed would have put a reasonable attorney on notice that he needed to investigate mental health and drug-related issues more thoroughly when defending a client against a charge—first degree, capital murder—for which raising a reasonable doubt as to intent could be crucial. *See, e.g., Seidel,* 146 F.3d at 755–56. We also hold that the district court clearly erred in finding that

Mr. Oliver made a tactical decision not to conduct any investigation into possible mental defenses. It is within the realm of possibility—consistent with *Hendricks*—that it would not have been ineffective to make a tactical decision to eschew a mental defense had Mr. Oliver performed a thorough investigation and consulted with his client. But Mr. Oliver did not make such an informed, strategic choice. Because he settled on a very weak alibi defense before conducting any investigation that might have led to a reasoned tactical choice, Mr. Oliver was ineffective within the meaning of *Strickland's* first prong.

■ But our analysis does not end here. We must determine whether, had Mr. Oliver undertaken the necessary investigation, it is reasonably probable that the outcome of Mr. Jennings' trial would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability does not mean that we must determine that the jury more likely than not would have returned a verdict for something beside first degree murder, but only that Mr. Jennings has shown "a probability sufficient to undermine confidence in the outcome." *Id.* At the district court's evidentiary hearing, several witnesses testified to what Mr. Oliver would have found had he undertaken a sufficient investigation. Although Dr. Hjortsvang died prior to the evidentiary hearing, his declaration addressing the significance of the information he did not have when conducting his preliminary evaluation is also part of the record.

Dr. Karen Gudiksen, a psychiatrist experienced with methamphetamine users, testified about what a thorough psychiatric evaluation—as opposed to the cursory, preliminary two hour exam Dr. Hjortsvang was asked to perform—would have revealed for purposes of the guilt phase. Because she focused on the first phase of

Mr. Jennings' trial, Dr. Gudiksen concerned herself with information that might have negated the intent element of first degree murder and militated in favor of a conviction for a lesser offense.

To conduct her examination, Dr. Gudiksen reviewed considerable evidence available to Mr. Oliver and any experts he might have employed for Mr. Jennings' trial, including police reports, the juvenile court file, divorce files, military records, a life chronology, declarations by family and friends, jail medical records, and a medical history she characterized as "complicated and extensive." Through her investigation, Dr. Gudiksen uncovered, among other things, a documented family history of mental illness including paranoid schizophrenia and severe alcoholism; consistent beatings of Mr. Jennings and his brothers by both parents throughout the boys' childhoods; molestation by both his grandfather and his mother; and a pattern of self-mutilation that began when Mr. Jennings was just six years old and that resulted in repeated bouts of gangrene when Mr. Jennings exacerbated the wounds with foreign agents such as toothpaste and battery acid.

Dr. Gudiksen's evaluation also revealed that, during the period leading up to Ms. Newman's murder, Mr. Jennings—at least partly as a result of his heavy methamphetamine use—was experiencing psychotic symptoms including hallucinations, delusions, memory gaps and periods of dissociation. Dr. Gudiksen concluded that the deleterious effects of Mr. Jennings' drug use worsened his underlying mental illness; with respect to the latter, Dr. Gudiksen concluded that Mr. Jennings "began the psychotic system of dissociating as a young boy. He probably manifested the psychotic sign of limited range of affect at about the same time. There were episodes of serious depression, with self-mutilations and overt suicidal acts. His

psychotic diagnosis best fits under the category of schizoaffective disorder." Dr. Gudiksen concluded that, at the time of the crime, Mr. Jennings was psychotic and dissociated. She found that he could not form the intent to kill, rape, rob, or burglarize, nor to premeditate or deliberate.

In his declaration, Dr. Hjortsvang explained the significance of the information he did *not* have available when he conducted his preliminary examination. After the fact, Dr. Hjortsvang reviewed Mr. Jennings' life history, declarations of family and friends, jail medical records, and the declarations of Dr. Gudiksen and mitigation expert Dr. Mindy Rosenberg. Referring to this information as "extremely important to consider in reaching an accurate and reliable assessment of Michael Jennings' mental state at the time the crime occurred," he concluded that, had he had the information when he first interviewed Mr. Jennings in 1982 and then met with him again just prior to the penalty phase, "it likely would have caused me to reach a different conclusion about his mental state." Dr. Hjortsvang told the court, "I am in agreement that at the very least, the amphetamine psychosis evidence could have been presented as a guilt phase defense in this case."

In rebuttal, the state called a psychiatrist, Dr. James Missett. Dr. Missett, who did not examine Mr. Jennings personally but did review all the records, thought that Dr. Hjortsvang's notes evidenced a "relatively complete" and "thorough" psychiatric exam. He also disputed Dr. Gudiksen's determination that Mr. Jennings suffered from schizoaffective disorder and amphetamine psychosis the night Ms. 6861 Newman was killed. He also called into question Dr. Gudiksen's conclusions that Mr. Jennings lacked the ability to deliberate and to form the intent to commit the

crime. Whether or not Dr. Missett's detailed testimony is persuasive, neither his testimony nor Dr. Hjortsvang's nor Dr. Gudiksen's was ever presented to a jury that could have weighed the evidence and made its own determination as to Mr. Jennings' mental state.

In *Bloom v. Calderon*, 132 F.3d 1267 (9th Cir.1997), we addressed a case similar to Mr. Jennings'. In *Bloom*, trial counsel had delegated the investigation and preparation of mental defenses to a third year law student (much as Mr. Oliver left penalty phase preparation in the hands of a newly-credentialed paralegal with no background in capital cases). *Id.* at 1271–72. Although the attorney in *Bloom* at least presented a psychiatric expert when his client faced three first degree murder charges at trial, his failure to follow through on the law student's work resulted in the psychiatrist having only 1.5 hours to talk with the defendant pre-trial—roughly the same amount of time Dr. Hjortsvang had to evaluate Mr. Jennings. *Id.* at 1272. On appeal, new counsel discovered considerable evidence available to trial counsel, including a family history of mental illness, child abuse, and spousal abuse; the defendant's exposure to prescription drugs with psychiatric side effects; a psychiatrist's recommendation that defendant receive inpatient care; and a jail psychologist's finding that defendant suffered from hallucinations. As Dr. Hjortsvang did in the instant case, the trial psychiatric expert submitted a declaration post-sentencing saying he had been provided insufficient information to make an accurate evaluation and that, upon review of all the relevant information, he believed Mr. Bloom had a mental disease that prevented him from appreciating the nature of his actions. *Id.* at 1274. Like Dr. Hjortsvang, Mr. Bloom's psychiatrist reported that the new information would have been "critical to any reliable assessment of ... mental functioning at the time

of the offenses ... I viewed my original report as an effort to assess, on the basis of a brief interview, [Defendant's] ability to stand trial and to formulate a psychiatric diagnosis." *Id.* at 1274–75.

In *Bloom*, we concluded that trial counsel had been prejudicially ineffective during the guilt phase. We held that, "[t]he complete lack of effort by Bloom's trial counsel to obtain a psychiatric expert until days before trial, combined with counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance. Counsel left the responsibility of obtaining and preparing this key witness to a third-year law student who, due to counsel's lack of diligence, had no idea what defense theory counsel intended to pursue." *Id.* at 1277. Quoting *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994), we found in *Bloom* that "[d]escribing [counsel's] conduct as 'strategic' strips that term of all substance." *Bloom*, 132 F.3d at 1277. We found that trial counsel put the defendant's mental state at issue and that the defense depended at least in part on negating the premeditation and malice necessary to justify a first degree murder conviction. *Id.* at 1278.

In *Seidel v. Merkle*, 146 F.3d 750 (9th Cir.1998), we again found counsel prejudicially ineffective for failing to conduct a reasonable investigation of guilt phase mental defenses. As in the instant case, Seidel's counsel made no investigation into his client's psychiatric history despite "abundant signs in the record that Seidel suffered from mental illness." *Id.* at 755. We focused on counsel's duty under *Strickland* to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* As we have done here, we concluded that counsel's inaction could not be viewed as "strategic" where he "failed

to conduct even the minimal investigation that would have enabled him to come to an informed decision." *Id.* at 756. Particularly relevant to Mr. Jennings' case, in *Seidel* we noted in our discussion of prejudice that, "[i]t is particularly curious that counsel requested and received jury instructions for both voluntary and involuntary manslaughter, but failed to present any evidence or argument to support a manslaughter finding." *Id.* at 757. Mr. Oliver likewise secured jury instructions for second degree murder and manslaughter, but did not present any evidence at trial to cast doubt on Mr. Jennings' ability to form the requisite intent for first degree murder.[6]

We conclude that a reasonably effective attorney who had undertaken an appropriately diligent investigation would likely have opted for a mental defense strategy. Because Mr. Jennings' alibi defense was weak and uncorroborated, and given the wealth of mental health and drug abuse evidence at the ready, effective counsel almost certainly would have made an effort to raise reasonable doubt as to Mr. Jennings' intent and his ability to undertake a "willful, deliberate, and premeditated killing" and his ability to act with "malice."[7] Cal. Pen.Code §§ 189 and 192 (1981).

We further find that it is reasonably probable that the jury—which deliberated for two full days before rendering its guilty verdict despite the overwhelming evidence that Mr. Jennings killed Ms. Newman—would have returned a verdict for second degree murder or manslaughter, both of which were presented as options, but neither of which was argued or supported by the case Mr. Oliver presented. Because the jury spent as long as it did deliberating, it is reasonably probable that, apprised of all of the mental health and drug abuse evidence, it would have found a reasonable doubt as to Mr. Jennings' ability to form the intent required for a first degree murder conviction. Although we cannot be certain that the result would have been different, we find the probability of a different result "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Therefore, Mr. Oliver's ineffective performance was prejudicial.

## CONCLUSION

Michael Oliver's unreasonable failure to investigate psychiatric evidence and possible medical defenses fell below the minimal standard of effectiveness that can be reasonably expected of defense counsel. Mr. Oliver's ineffective assistance prejudiced Mr. Jennings by depriving him of the opportunity to help his counsel make informed judgments as to his defense and

---

**6.** At the time of the homicide and Mr. Jennings' trial, California defined degrees of murder as follows:

> All murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 286, 288, 288a, or 289, is murder of the first degree; and all other kinds of murders are of the second degree.

Cal. Pen.Code § 189 (1981). California defined manslaughter as "the unlawful killing of a human being without malice" and voluntary manslaughter as a manslaughter committed "upon a sudden quarrel or heat of passion." Cal. Pen.Code § 192 (1981).

**7.** Even had Mr. Oliver stuck to the alibi defense, had he undertaken an appropriate investigation into Mr. Jennings' mental health he may have been able to switch gears and marshal an effective argument to save his case after the only evidence corroborating the alibi unexpectedly evaporated at trial.

potentially to have a defense presented that would have negated the mental state necessary for a first degree murder conviction. Because we reverse Mr. Jennings' conviction as a result of Mr. Oliver's ineffectiveness during the guilt phase, we do not reach Mr. Jennings' penalty phase claim. Likewise, we do not determine whether Mr. Oliver's conflicts of interest would also require reversal.

We reverse the district court's denial of a writ of habeas corpus, vacate Mr. Jennings' conviction, and remand to the district court with instructions to grant the petition for a writ of habeas corpus unless the State within a reasonable period grants a new trial.

**REVERSED AND REMANDED WITH INSTRUCTIONS. CONVICTION VACATED. REMANDED TO THE DISTRICT COURT WITH INSTRUCTIONS TO REMAND TO THE STATE COURT FOR A NEW TRIAL.**