**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JACKSON CHAMBERS DANIELS, JR.,
  *Petitioner-Appellee,*

v.

JEANNE S. WOODFORD, Warden, of
California State Prison at San
Quentin,
  *Respondent-Appellant.*

No. 02-99002
D.C. No.
CV-92-04683-JSL

JACKSON CHAMBERS DANIELS, JR.,
  *Petitioner-Appellant,*

v.

JEANNE S. WOODFORD, Warden, of
California State Prison at San
Quentin,
  *Respondent-Appellee.*

No. 02-99003
D.C. No.
CV-92-04683-JSL
OPINION

Appeal from the United States District Court
for the Central District of California
J. Spencer Letts, District Judge, Presiding

Argued and Submitted
February 10, 2004—Pasadena, California

Filed November 2, 2005

Before: Betty B. Fletcher, Harry Pregerson, and
Warren J. Ferguson, Circuit Judges.

Opinion by Judge Pregerson

14945

**COUNSEL**

John T. Philipsborn, San Francisco, California and John G. Cotsirilos, San Diego, California, for the petitioner-appellee/cross-appellant.

Warren P. Robinson, Deputy Attorney General, San Diego, California, for the respondent-cross-appellant/appellee.

**OPINION**

PREGERSON, Circuit Judge:

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Jackson Chambers Daniels, Jr., is a sixty-six-year-old paraplegic on California's death row. On December 1, 1983, Daniels was convicted of two counts of first-degree murder for the shooting deaths of police officers Dennis Doty and Phil Trust.

Daniels shot and killed the officers when they attempted to take him into custody following the denial of his appeal on an earlier robbery conviction. Daniels was sentenced to death on January 31, 1984.

## I.  Events Prior to the Instant Offense

To understand the circumstances of the murders of officers Doty and Trust, it is necessary to first review the events surrounding a bank robbery Daniels committed in 1980. Attempting to flee from that robbery, Daniels was shot nine times by police officers. As a result of the shooting, Daniels was rendered a paraplegic and confined to a wheelchair. Pursuant to a plea agreement negotiated by Daniels's public defender and the prosecutor, Daniels agreed to plead guilty in exchange for being permitted to remain free on his own recognizance for six months so that he could seek medical treatment and rehabilitation for his injuries. Despite this plea agreement, after Daniels pled guilty, the trial court sentenced him to thirteen years in prison and remanded him to immediate custody.

On the same day Daniels was sentenced, attorney Andrew Roth, who knew Daniels from prior representations, met Daniels in the hall of the court house. Roth later testified that Daniels appeared to be "in great distress due to improper medical care." Roth later visited with Daniels in custody and, although Daniels's physical distress was somewhat lessened, Roth was disturbed by Daniels's psychological condition and expression of suicidal thoughts. After this meeting with Daniels, Roth took over Daniels's case and appealed the robbery conviction on the ground that the plea agreement had been violated because the trial court did not permit Daniels to seek six months of rehabilitation and treatment before surrendering to custody. During the pendency of that appeal, Daniels was released on bond.

In 1981, while Daniels remained free on bond, a Riverside police officer mistakenly arrested Daniels on the erroneous

belief that a warrant had been issued for his arrest. In a suit for money damages filed in state court against the City of Riverside, Daniels alleged that while in custody, he was beaten, dragged into a jail cell without his wheelchair, and denied necessary medical care, including a catheter. As a consequence, Daniels required treatment for urine poisoning and became fearful of being returned to custody. According to Daniels, he feared incarceration because the prison system lacked the medical professionals and supplies necessary to provide the care he needed as a paraplegic.

## II.   The Current Offense

In April 1982, the California Court of Appeal denied Daniels's appeal of his bank robbery conviction, and Daniels was ordered to surrender to custody. When he failed to appear at two hearings as ordered, a warrant was issued for his arrest. On May 13, 1982, officers Doty and Trust were sent to arrest Daniels at the residence of James Cornish.

When the officers arrived at the Cornish home, they were shown to Daniels's bedroom by his caretaker, Renee Ross. According to Ross, only she, Daniels, the two officers, and Cornish's infant son were in the house at the time. The officers found Daniels sitting on his bed wearing only a shirt. While Ross was assisting Daniels with getting dressed, Daniels reached between his legs and produced a gun. When Ross saw Daniels with the gun, she ducked into a bedroom closet. From inside the closet, Ross heard gunshots in the bedroom.

After the gunfire stopped, Daniels called Ross out of the closet. Ross saw Daniels sitting on the floor with a gunshot wound in his right hand. Doty was lying on the floor. At Daniels's direction, Ross assisted Daniels into his wheelchair. As they left the house, Ross saw Trust in another bedroom, kneeling on the floor.

Daniels instructed Ross to drive to Delores Butler's home. During the drive, Daniels told Ross that he had "pa[id] them

back because of what they had done to him" and that the police had previously shot him nine times. When Butler asked about the injury to his hand, Daniels admitted killing the two officers. With Ross's help, Daniels then fled to Ted Smith's house, where he was later apprehended by the police.

Before his arrest, Daniels told Ted Smith what had happened that morning. According to Smith, Daniels told him that after he shot Doty, Trust shot the gun out of his hand. When Daniels fell to the floor, he got Doty's gun and used that to shoot Trust. Ballistics evidence supports Daniels's confession, showing that (1) Doty was shot three times from an unidentified gun; (2) Trust had fired four bullets, three of which were recovered in the house, the fourth in Daniels's hand; and (3) Trust had been shot six times, primarily with Doty's gun.

## III. Appointment of Counsel

The trial court appointed the Riverside County Public Defender's Office to represent Daniels during the trial on the murder charges. At his arraignment, Daniels was represented by Patricia Lahti, but Daniels moved to have attorney Roth substituted as his counsel.[1] Roth, who also attended Daniels's arraignment, advised the court that he was available to represent Daniels.

As the basis for his motion to substitute counsel, Daniels explained to the trial court that he had a conflict of interest with the Public Defender's Office, which had represented him in plea negotiations concerning the 1980 robbery arrest. The conflict arose when, unknown to Daniels, his public defender in the robbery case, Patrick Magers, simultaneously engaged in negotiations with the District Attorney's Office for Dan-

---

[1]Daniels specified Roth because Roth was an established criminal defense attorney with whom Daniels had a relationship of trust and confidence.

iels's plea and—acting in his own interest—for a position within the same District Attorney's Office. Indeed, after Daniels accepted the plea agreement, Magers left the Public Defender's Office to work in the District Attorney's Office, and Daniels was assigned a new public defender for his sentencing hearing. Neither the prosecutor nor the public defender who replaced Magers apprised the court of the plea agreement's condition permitting Daniels to seek treatment in lieu of immediate incarceration. This is why, at the sentencing hearing, Daniels was remanded to immediate custody.

Patricia Lahti, Daniels's public defender at his arraignment on the murder charges, notified the court that Daniels had filed a federal habeas petition alleging that the public defender in his robbery case had provided ineffective assistance of counsel.[2] Although she believed it was "close," she declined to state that a conflict existed.[3] Nevertheless, Lahti urged the court to appoint Roth as Daniels's counsel, advising the court that Daniels mistrusted the Public Defender's Office, would not cooperate with it in his representation, and that she could not assure Daniels that the office would effectively represent him.

---

[2]As the district court pointed out, because the robbery conviction would be introduced as evidence at the murder trial, Daniels's public defender would be required to argue that the office had provided ineffective assistance of counsel in the robbery case. But, if Daniels's habeas petition was still pending, the office would be required to defend the conviction in that proceeding.

[3]Lathi lacked the authority to declare a conflict without the approval of head Public Defender Malcolm McMillian. McMillian, however, refused to declare a conflict. At about this time, McMillian's office had come under fire: McMillian was under investigation for his management of the office by a Grand Jury and by a two-member panel appointed by the Riverside County Board of Supervisors. Part of this investigation inquired into complaints that McMillian was declaring too many conflicts and thereby causing the County of Riverside to expend additional funds on alternate counsel to represent indigent defendants.

Despite this evident conflict, the trial court denied Daniels's motion to substitute counsel.[4] At Roth's urging, Deputy Public Defender Robert Keller undertook representation of Daniels after Roth promised that he would work on Daniels's case pro bono. Keller himself voiced strong reservations about the appointment, writing to Public Defender McMillian that there was an "obvious" conflict of interest in the Office's representation of Daniels and asking McMillian to withdraw from the case. After the Office again refused to declare a conflict, Keller became the attorney of record, while Roth took the actual lead in the case.

Roth was appointed co-counsel on October 15, 1982. One month later, the prosecution moved to have Roth removed on the ground that the state intended to call him as a witness to testify regarding Daniels's robbery conviction and appeal. According to the prosecution, Roth's testimony was necessary to establish that Daniels knew that his appeal had been denied and that he was to return to custody. Under the prosecution's theory of the case, whether Roth told Daniels to surrender to custody was material on the issues of premeditation, deliberation, and malice aforethought.

In opposing the motion, Roth argued that the attorney-client privilege prohibited him from revealing his communications with Daniels and that, in any event, evidence on these issues was available through other sources.[5] In addition, Daniels agreed to stipulate that Roth had informed him about the

---

[4]After this ruling, Lahti again urged the court to appoint Roth, stating that the office had not ruled out a conflict. According to Lahti, "It's very rare that a defendant walks into court and asks our office be removed because he is suing us literally for incompetency and has an active case on appeal or before the court."

[5]For example, in a declaration filed with his habeas challenge to his robbery conviction, Daniels stated that the California Supreme Court had denied his appeal. This declaration was dated April 20, 1982, and would have established that Daniels knew the appeal had been denied before he was to surrender and before officers Doty and Trust came to arrest him.

denial of his appeal and had advised him to surrender. Daniels also agreed to waive all conflicts after Roth arranged for him to consult with separate counsel. Despite these assurances, the trial court removed Roth, leaving Keller as Daniels's only counsel.

One month later, Keller became too ill to work on Daniels's case, and it was assigned to two other deputy public defenders. Two months later, Daniels's new counsel recommended to a new head Public Defender that the Office withdraw as counsel due to a conflict of interest in its representation of Daniels. Consequently, more than nine months after its appointment, the Public Defender's Office was permitted to withdraw as counsel based on its declared conflict of interest, the same conflict Daniels had raised at his arraignment.

The trial court did not re-appoint attorney Roth to replace the public defender. Instead, the court appointed Carl Jordan, a former Riverside County prosecutor who had just started in solo private practice. Daniels's capital murder case was Jordan's first criminal defense matter. Indeed, Jordan had never handled a death penalty case as either a prosecutor or defense attorney, and his new office lacked the administrative and legal resources necessary to defend such a case. Jordan hoped the case would lead to future appointments.

To assist Jordan, the trial court appointed Warren Small as co-counsel. At the time he was appointed, Small had been practicing law for two and a half years as a solo practitioner and had no experience trying homicide cases. Like Jordan, this was Small's first capital case. Despite his inexperience, Small was tasked with preparing all pleadings, legal arguments, and jury instructions that would be necessary during the trial. He was also given responsibility for preparing the penalty phase defense in consultation with Jordan.

From the beginning of their representation, the attorney—client relationship between Daniels and his defense counsel was strained. Daniels questioned whether Small had sufficient experience to properly handle his defense. More importantly, Daniels suspected Jordan's motives in representing him because of Jordan's past experience as a Riverside County prosecutor, a factor that Daniels believed made Jordan easier for the court and district attorney to control. To Daniels, it appeared that Roth had been removed as his counsel at the behest of the district attorney because he was a strong advocate on Daniels's behalf. Daniels viewed Roth's removal as part of a larger conspiracy between the police, courts, and district attorney to prevent Daniels from presenting a defense and thereby ensure his execution.[6] Daniels believed his defense team was part of this conspiracy and that Jordan had been appointed to hasten his conviction and death sentence.[7]

The trial court was aware of the conflict between Daniels and his counsel. On June 3, 1983, Daniels told the trial court "I don't trust Mr. Jordan and there has been some things that happened that has increased my doubt about him properly representing me." Before the guilt phase of his trial began, Daniels sent a letter to the trial court informing the court that he did not trust his counsel. *People v. Daniels*, 802 P.2d 906, 918 (Cal. 1991). In this letter, Daniels expressed his belief that his attorneys' representation was ineffective, that they were not interested in providing effective representation and were, in fact, talking to the prosecution outside of his presence. Daniels also expressed his belief that there was a conspiracy to kill him.

By the time Jordan and Small were appointed as defense counsel, they were left with roughly three months to prepare

---

[6]Daniels also believed that his erroneous arrest in 1981 was part of a police plot to kill him.

[7]Roth, who spoke with Daniels during this time, believed that Daniels's distrust of Jordan and Small seemed "unrealistically extreme."

Daniels's defense.[8] This short time was exacerbated by the lack of preparation done on the case during the public defender's nine month tenure.[9] When Jordan and Small took over, very little work, if any, had been done to investigate Daniels's mental state as possible mitigating evidence. No psychiatric or psychological testing had been done. In addition, there had been no investigation of the crime scene by defense counsel and, by the time Jordan was appointed more than nine months later, much of the evidence was no longer available, and the crime scene had been cleaned and repaired by the owner of the home. Thus, Jordan and Small had approximately three months to do the bulk of the investigative and trial preparation for both the guilt and penalty phases in their first capital murder case and no access to the crime scene or to other evidence.

This exceedingly short period of time was further aggravated by the inability of counsel to meaningfully consult with their client as a result of Daniels's paranoia and distrust. According to Small, because of Daniels's experiences prior to their appointment—including the removal of Roth, the conflict with the Public Defender's Office, and that office's failure to timely declare a conflict—it was "difficult to establish the relationship of trust and confidence that should characterize the attorney—client relationship."[10] Instead, Daniels's lack of trust and confidence in his defense counsel's motives

---

[8]Indeed, in moving for a continuance, Jordan argued that Daniels would be denied effective representation if the trial was forced to proceed as scheduled. At the hearing on the motion for continuance, however, Daniels refused to waive time and the motion was denied.

[9]According to Keller, he had done little preparation on the case because he believed "that eventually the Public Defender would have to declare what [he] thought was an obvious conflict of interest in Mr. Daniels's case."

[10]Nor could attorney Roth be of much assistance to Jordan and Small. By the time the two were appointed, Roth had been designated as a prosecution witness and feared that the trial court might rule that any disclosure of the content of Daniels's communications to Jordan and Small might place the communication outside the attorney-client privilege.

resulted in a total lack of communication between them. Thus, Daniels proceeded to trial with defense counsel he did not trust and who lacked the time and experience to adequately try a capital murder case.

## IV. Trial and Conviction

The State of California tried Daniels for first degree murder, alleging that he acted with premeditation and malice aforethought in killing officers Doty and Trust in retaliation for the injuries he received after the bank robbery. The evidence against Daniels included the testimony of Ross, who was in the house at the time of the murders. In addition, Ross, Butler, and Smith all testified that Daniels admitted to them that he had shot the officers. This testimony was supported by the ballistics evidence from the crime scene.

Despite the overwhelming evidence of Daniels's guilt, Daniels's counsel presented a defense that Daniels was not the perpetrator of the officers' murders. Although he appeared willing to testify in his own behalf—and despite the fact that his counsel believed that the only valid defense strategy was for Daniels to testify—Daniels did not testify.[11] Instead, Jordan attempted to paint Daniels as having a generally positive attitude toward the police even after the 1980 shooting. Jordan also attempted to establish that the gunshot injury to Daniels's hand would have made it difficult for him to have committed the murders.

After closing arguments, the jury deliberated for just a few hours before delivering a verdict of guilty on two counts of first degree murder with special circumstances for (1) multiple murder; (2) murder committed to avoid lawful arrest; and (3) murder of police officers engaged in the performance of

---

[11]Indeed, Jordan himself believed there was no credible defense to Daniels's guilt and that the only valid defense strategy was for Daniels to testify.

their duties. The verdicts were returned on December 1, 1983. The defense team had eleven days to prepare for the penalty phase.

## V.   Penalty Phase

The penalty phase proceedings began on December 12, 1983. One month earlier, recognizing that his time had been devoted exclusively to guilt phase preparation, Jordan had moved for a continuance on the penalty phase. In that motion, Jordan argued that he lacked sufficient time to adequately prepare for the penalty phase. According to Jordan, "most, if not all," of the witnesses he intended to use for testimony on mitigation had yet to be interviewed, and most of these witnesses resided out of state. Jordan also filed a motion to substitute Roth as counsel for the penalty phase. Both motions were denied.

During the penalty phase, Jordan relied on the testimony of psychologist Robert Banks. Jordan did not retain Banks for a psychological diagnosis, but rather for the limited purpose of conducting a preliminary screening of Daniels, to get "impressions" of Daniels in order to determine whether further evaluation was necessary. After his preliminary screening of Daniels suggested the presence of an organic brain disease, Banks attempted to secure the assistance of neuropsychology experts for further evaluations. However, he was unsuccessful, and defense counsel never sought further evaluation. Indeed, because Jordan did not request additional funds for mental health expert testimony until one week before the penalty phase was to begin, no further evaluations were conducted prior to the penalty phase.[12]

Further, defense counsel failed to follow up on earlier psychiatric evaluations of Daniels. For instance, after the 1980

---

[12]Incomprehensibly, this funding request was eventually granted, but not until one month after Daniels was sentenced to death.

shooting rendered him a paraplegic, Daniels received treatment from psychiatrist Robert Philips. In November 1982, while he still represented Daniels, public defender Keller had corresponded with Philips. Even though Philips had established a good rapport with Daniels, Jordan did not attempt to obtain Philips's assistance and instead sought the assistance of another psychiatrist, Dr. Anthony Oliver. Daniels refused to speak or otherwise cooperate with Oliver or to provide "any information pertinent to [his] purpose." Rather, Daniels stated that he believed his conversation with Oliver was being monitored. To Oliver, this belief, paired with Daniels's distrust of his counsel and the legal process, indicated a degree of paranoid ideation.[13] Jordan did not follow up on Oliver's assessment, however. Consequently, despite his limited evaluation, Banks was the only mental health practitioner to testify on Daniels's behalf.

Banks's testimony was problematic for several reasons. Banks was not a forensic psychologist and lacked the credentials to testify in a death penalty case. Banks's only experience as an expert witness was in evaluating children for family court child custody cases; he had never before testified in a death penalty case. In addition, Banks intentionally limited his evaluation of Daniels: (1) Banks confined his interview of Daniels to the time period *before* the 1980 robbery; (2) Banks's evaluation did not include any consideration of the events surrounding the murders for which Daniels was charged; and (3) Banks limited his evaluation to just a few

---

[13]Oliver also stated that he did not find any evidence of psychopathology to indicate a mental impairment that would bear on the issue of criminal responsibility. The State has latched onto this statement to repeatedly contend that it establishes that Daniels suffered from no mental illness. What the State repeatedly neglects to mention, however, is that Oliver did not speak with Daniels, who refused to cooperate in the attempted examination. Consequently, Oliver was unable to administer any diagnostic tests or otherwise evaluate Daniels's mental state. In short, Oliver's letter does not come close to being as determinative as the State would have this court believe.

screening tests. Moreover, during his testimony, Banks admitted that he had not fully reviewed even the scant psychological background materials provided to him by Jordan.

Based on his limited screening, Banks testified that Daniels was likely schizophrenic and showed signs of brain damage. Dr. Sherry Skidmore, who later reviewed Banks's evaluation, found that he was conservative in his conclusions. Nevertheless, because Banks had so circumscribed his examination of Daniels, the State was able to effectively discredit his results on cross-examination by emphasizing Banks's lack of expertise, lack of preparation, and limited evaluation. In addition, during his testimony, Banks himself questioned whether the term "sociopath" applied to Daniels, opening this topic for discussion by the State's rebuttal witness.

In rebuttal, the State's expert, Dr. Rex Julian Beaber, attacked Banks's testimony, particularly the validity of certain tests Banks relied on in evaluating Daniels. In contrast to Banks, Beaber was an experienced and nationally certified, forensic psychologist. According to Beaber, the limited information relied on by Banks warranted the conclusion that Daniels was a sociopath.[14] Beaber went on to define "sociopath" as someone "without a conscience."

Jordan did not present any witness in sur-rebuttal. Thus, the jury heard no psychological testimony to mitigate or explain Daniels's behavior other than the testimony of an unqualified and incompetent psychologist. Instead, Beaber's testimony that Daniels was a violent sociopath was the final impression the jury had of Daniels before it began its deliberations on his sentence. After two days of deliberations, the jury returned a verdict imposing death.

---

[14]As discussed below, when the district court held an evidentiary hearing on Daniels's habeas petition, the court appointed its own expert psychologist. This expert testified that neither of the psychologists who testified at the penalty phase had sufficient information on Daniels to make a reliable diagnosis.

## VI. Federal Habeas Petition & Evidentiary Hearing

The California Supreme Court upheld Daniels's conviction and sentence on direct appeal. *Daniels*, 802 P.2d at 950. His state habeas petition was denied on July 22, 1992. Daniels filed a federal habeas petition on October 22, 1992. On July 1, 1999, the district court granted Daniels's April 30, 1993 motion for an evidentiary hearing on Daniels's claims of ineffective assistance of counsel.

For the evidentiary hearing, Dr. Richard Dudley, Jr., a licensed psychiatrist, performed a comprehensive evaluation of Daniels, including a review of Daniels's records, witness interviews, and a psychiatric examination of Daniels.[15] In his evaluation, Dudley examined Daniels's family, developmental, and criminal history as well as his medical and psychiatric records, including a series of impressions and opinions by prison psychiatrists, psychologists, and social workers. Dudley also reviewed the medical records relating to Daniels's injuries following the 1980 shooting, Daniels's own writings prepared during his capital trial, and transcripts of Banks's and Beaber's testimony.

Dudley's review of Daniels's records disclosed that, at various times prior to 1980, Daniels was described as exhibiting signs of mental disorders. Based on Daniels's history and psychiatric evaluations, Dudley concluded that Daniels suffered from an "underlying mixed personality disorder" at least since the time he became an adult.[16] To Dudley, the 1980 shooting

---

[15]Dudley evaluated Daniels using the diagnostic criteria in use between May 1982 and March 1984, the period between Daniels's arrest and conviction. At that time, the Diagnostic and Statistical Manual of Mental Disorders III ("DSM-III") was in use and Dudley relied on that manual for his diagnosis.

[16]In large part, Dudley confirmed an earlier diagnosis that Daniels suffered from organic brain damage. However, Dudley indicated that further testing was needed to determine if it was the result of the shooting. Without this testing, Dudley concluded there was insufficient evidence to confirm or eliminate a diagnosis of brain damage and, thus, Dudley did not consider brain damage as a factor in his opinion.

was significant to any evaluation of Daniels's mental state before and after the 1982 shooting of officers Doty and Trust.

Dudley believed there was a clear deterioration of Daniels's mental state after 1980. A major factor in this deterioration was the 1980 shooting, from which Daniels suffered a profound physical trauma and severe damage to his psychological foundation. Even before this shooting, there was evidence that Daniels thought the police were "targeting" him. After the shooting, Daniels began to exhibit signs of a post-traumatic stress disorder. In Dudley's opinion, Daniels's feelings of persecution toward his defense counsel and the court system rose to the level of a paranoid delusion.[17] The delusions that characterized Daniels's paranoid disorder affected his behavior and prevented him from cooperating with his counsel. Dudley reasoned that it was this disorder that caused Daniels to believe his own defense counsel were part of a conspiracy to kill him.

Most important, Dudley concluded that it was likely that at the time of the instant offense, Daniels's paranoia had already developed and was exacerbated by the post-traumatic stress disorder resulting from the 1980 shooting, the 1981 mistaken arrest, and by Daniels's occasional cocaine use in the period before the shootings. Ultimately, Dudley reached the opinion that Daniels had a mental disorder both before and during May 1982. Thus, at significant times prior to the shootings, as well as during the shooting and later during the trial, Daniels suffered a paranoid disorder. Daniels's symptoms of this paranoid disorder persisted at least until the time of his interview with Dudley. In Dudley's opinion, if competent psychiatrists

---

[17]"Paranoid delusion" is the term used from 1982 to 1984. Today, this mental disorder is referred to as a "delusional disorder." A delusion "involves a '. . . false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constituted incontrovertible and obvious proof or evidence to the contrary.' " Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders app. C (rev. 4th ed. 2002) ("DSM-IV").

had had access in 1982 to the information available to him in this review, they would have reached the same conclusions as he did.

Also considered at the evidentiary hearing was a declaration filed by psychiatrist Fred Rothenberg, who was retained by Daniels's post-conviction counsel to provide psychiatric evaluations of Daniels. As part of his evaluation, Rothenberg reviewed portions of Daniels's medical records, including prison medical records, and medical testimony from his capital trial. Rothenberg also performed a psychiatric evaluation of Daniels and administered certain psychological tests.

Based on his testing and record review, Rothenberg concluded that Daniels suffers from organic brain damage related to anoxia.[18] Of particular relevance to this diagnosis was the 1980 shooting, from which Daniels suffered significant blood loss and shock. According to Rothenberg, insufficient blood pressure, and the resulting reduction of blood flow to the brain, can result in anoxia and brain damage.[19] This diagnosis was also indicated from previous testing that showed brain

_____

[18]Anoxia, also known as cerebral hypoxia, refers to a condition in which there is a decrease of oxygen supply to the brain even though there is adequate blood flow. This condition can result from drowning, strangling, choking, suffocation, cardiac arrest, head trauma, carbon monoxide poisoning, and complications of general anesthesia. Mild anoxia can result in "inattentiveness, poor judgment, memory loss, and a decrease in motor coordination. Brain cells are extremely sensitive to oxygen deprivation and can begin to die within five minutes after oxygen supply has been cut off. When [anoxia] lasts for longer periods of time, it can cause coma, seizures, and even brain death." Recovery depends on the duration of the oxygen deprivation and the amount of resulting brain damage. The longer the episode, the lower the chances of a full or meaningful recovery. *See* National Institute of Neurological Disorders and Stroke, Cerebral Hypoxia Information Page, *at* http://www.ninds.nih.gov/health_and_medical/disorders/anoxia_doc.htm.

[19]Rothenberg also suggested further testing to measure the extent of Daniels's impairment. The district court denied this request for ancillary funds.

damage and from the results of the psychological testing administered by Rothenberg. It was further confirmed by Daniels's behavior, history, and the results of other cognitive testing that revealed Daniels's difficulty with coordination and attention.[20]

Rothenberg's preliminary psychiatric diagnosis was that Daniels suffered from Organic Personality Disorder and Dementia secondary to brain damage. This condition rendered Daniels "unable to assist counsel [at certain times] in a rational manner because of a combination of physical, emotional and psychological factors." According to Rothenberg, Daniels's brain damage existed at least since the 1980 shooting. The resulting personality disorder was also characteristic of Daniels prior to the 1982 shooting of officers Doty and Trust. In support of this contention, Rothenberg pointed to a prison file containing results of tests earlier administered to Daniels, including a Bender Gestalt[21] test from 1984 that evidenced brain damage.

Finally, the district court retained Dr. John Stalberg as its case expert to review Daniels's files. Stalberg testified that the information made available to Banks and Beaber at the time of Daniels's trial was inadequate. Consequently, neither Banks nor Beaber had sufficient information to make a reliable or informed diagnosis. Although Stalberg disagreed with Rothenberg's conclusion that Daniels suffered organic brain damage, he believed that Oliver's findings and opinion, expressed in 1983, were "disturbing," and suggested that Daniels's mistrust of counsel indicated a paranoia that would, or

---

[20]In addition to the 1980 shooting, Daniels had suffered other head injuries, including a severe motor vehicle accident. Each of these injuries rendered Daniels unconscious and, according to Rothenberg, created a high likelihood of organic brain damage.

[21]The Bender Visual Motor Gestalt ("Bender Gestalt") Test is used to measure the cognitive and developmental functioning of children and adults.

should, have raised significant questions about Daniels's competency bearing on possible defenses or mitigation.

After four days of hearings, the district court granted Daniels's petition in part. The district court affirmed Daniels's conviction, but ordered a new penalty phase trial. The district court concluded that the lack of communication between Daniels and his counsel resulted in the constructive denial of Daniels's Sixth Amendment right to counsel at the penalty phase. The court also found that Daniels was prejudiced by his counsel's ineffective penalty phase representation such that he was denied his right to effective assistance of counsel. Finally, the court held that Daniels's due process rights were violated by the cumulative effect of several trial court errors, in particular the trial court's denial of Daniels's motion to change venue and its failure to instruct the jury that it could consider overlapping special circumstances as only a single factor in aggravation. Accordingly, the district court vacated Daniels's death sentence. Unless the State opted to grant Daniels a new penalty trial within 120 days of the entry of judgment, the court ordered that Daniels be re-sentenced to life in prison without the possibility of parole.[22] Both Daniels and the State appeal.

In its appeal, the State argues that the district court erred in granting Daniels penalty phase relief. Specifically, the State appeals the district court's findings (1) that Daniels was constructively denied counsel at the penalty phase of his trial; (2) that Daniels was prejudiced by ineffective penalty phase representation; and (3) that Daniels's due process rights were denied at the penalty phase by the trial court (a) denying Daniels's motion to change venue and (b) failing to instruct the jury that it could consider overlapping special circumstances as only a single factor in aggravation. The State further argues that the district court correctly denied Daniels's petition as to the guilt phase of his trial.

---

[22]We earlier denied the State's motion for a stay of the district court's judgment pending appeal.

Daniels appeals the district court's denial of guilt phase relief. Specifically, Daniels argues that, for the same reasons articulated by the district court as to the penalty phase, he was also (1) constructively denied counsel and (2) prejudiced by his counsel's ineffective assistance at the guilt phase of his trial. Daniels further argues that the district court correctly granted him penalty phase relief on these grounds. In addition, he argues that the district court properly concluded that his due process rights were violated at the penalty phase because the state court gave an erroneous jury instruction and rejected his change of venue motion.[23]

## STANDARD OF REVIEW

We review the district court's decision to grant or deny a 28 U.S.C. § 2254 habeas petition de novo. *Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). Findings of fact made by the district court are reviewed for clear error. *Id.* Habeas relief should be granted where the alleged errors "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). A state court's conclusion that a constitutional error was harmless is reviewed de novo.[24] *Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002).

---

[23]Daniels does not, however, argue that the denial of his venue motion violated his due process rights at the guilt phase.

[24]Because his habeas petition was filed on October 22, 1992, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standards of review do not apply to Daniels's petition. *See Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (noting that pre-AEDPA standards of review apply when petition filed before effective date); *Smith v. Robbins*, 528 U.S. 259, 268 n.3 (2000) (noting AEDPA does not apply to petitions filed before its effective date of April 24, 1996).

## DISCUSSION

## I.   Sixth Amendment Right to Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right has two components: (1) the right to counsel's undivided loyalty, *Wood v. Georgia*, 450 U.S. 261, 272 (1981), and (2) the right to reasonably competent counsel, *McMann v. Richardson*, 397 U.S. 759, 770-71 (1970). Daniels's habeas petition implicates both of these components.

### A.   *Constructive Denial of Counsel*

[1] A defendant has a Sixth Amendment right to conflict-free representation. *United States v. Moore*, 159 F.3d 1154, 1157 (9th Cir. 1998). Not every conflict between a defendant and counsel, however, implicates the Sixth Amendment. *See Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000). As the Supreme Court has explained, the right to counsel does not guarantee "a right to counsel with whom the accused has a 'meaningful attorney-client relationship.' " *Morris v. Slappy*, 461 U.S. 1, 3-4 (1983). Nevertheless, where a court "compel[s] one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in [an] irreconcilable conflict [it] deprive[s] him of the effective assistance of any counsel whatsoever." *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970). Thus, a reviewing court must assess the nature and extent of the conflict and whether that conflict deprived the defendant of representation guaranteed by the Sixth Amendment. *Schell*, 218 F.3d at 1027.

Here, the conflict was not one created by Daniels or by his counsel. Rather, it was created by a series of events that occurred before the appointment of Jordan and Small, in particular, certain decisions of the state trial court regarding the

selection and removal of counsel. As detailed above, these decisions included the trial court's (1) refusal to recognize the clear conflict between Daniels and the Public Defender's Office until more than nine months had elapsed; (2) removal of Roth as counsel despite Daniels's willingness to waive any conflict and to stipulate to the facts to which Roth would presumably testify; and (3) appointment of a former prosecutor, with no criminal defense experience and only three months to prepare, to represent Daniels. Given this history, it is understandable that Daniels would mistrust the judicial process and his counsel. When viewed in the context of Daniels's paranoid delusions—including his belief that his defense counsel was conspiring with the prosecution to kill him—it is easy to see why this mistrust led to a complete breakdown of communication.

The Supreme Court has repeatedly held that a defendant's Sixth Amendment right to counsel is violated if the defendant is unable to communicate with his or her counsel during key trial preparation times. *See Riggins v. Nevada*, 504 U.S. 127, 144 (1992) ("We have held that a defendant's right to the effective assistance of counsel is impaired when he cannot cooperate in an active manner with his lawyer. The defendant must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf.") (citations omitted); *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) ("The Court has uniformly found constitutional error without any showing of prejudice when counsel was . . . prevented from assisting the accused during a critical stage of the proceeding."); *Geders v. United States*, 425 U.S. 80, 91 (1976) (holding that trial judge's order that counsel could not communicate with defendant during overnight recess in the middle of trial violated defendant's Sixth Amendment right).

We have applied the constructive denial of counsel doctrine to cases where the defendant has an irreconcilable conflict with his counsel, and the trial court refuses to grant a motion for substitution of counsel. *See United States v. Nguyen*, 262

F.3d 998, 1003-04 (9th Cir. 2001); *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 778-79 (9th Cir. 2001). The test for determining whether the trial judge should have granted a substitution motion is the same as the test for determining whether an irreconcilable conflict existed. *United States v. Moore*, 159 F.3d 1154, 1159 n.3 (9th Cir. 1998). The court must consider: (1) the extent of the conflict; (2) whether the trial judge made an appropriate inquiry into the extent of the conflict; and (3) the timeliness of the motion to substitute counsel. *Id.* at 1158-59.

### 1. The Extent of the Conflict

**[2]** Where a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel. *Adelzo-Gonzalez*, 268 F.3d at 779. This is true even where the breakdown is a result of the defendant's refusal to speak to counsel, unless the defendant's refusal to cooperate demonstrates "unreasonable contumacy." *Brown v. Craven*, 424 F.2d 1166, 1169 (9th Cir. 1970); *see also Nguyen*, 262 F.3d at 1003-04 (quoting and applying *Brown*); *Adelzo-Gonzalez*, 268 F.3d at 780 (same).

"Even if [trial] counsel is competent, a serious breakdown in communications can result in an inadequate defense." *Nguyen*, 262 F.3d at 1003 (citing *United States v. Musa*, 220 F.3d 1096, 1102 (9th Cir. 2000)); *see also United States v. D'Amore*, 56 F.3d 1202, 1206 (9th Cir. 1995) ("[A] court may not deny a substitution motion simply because [it] thinks current counsel's representation is adequate."), *overruled on other grounds by United States v. Garrett*, 179 F.3d 1143 (9th Cir. 1999).

**[3]** Daniels's relationship with his trial attorneys is similar to that in *Nguyen*, where we held that Nguyen was constructively denied counsel. *Nguyen*, 262 F.3d at 1004 ("There is no question in this case that there was a complete breakdown in

the attorney-client relationship. By the time of trial, the defense attorney had acknowledged to the Court that Nguyen 'just won't talk to me anymore.' In light of the conflict, Nguyen could not confer with his counsel about trial strategy or additional evidence, or even receive explanations of the proceedings. In essence, he was 'left to fend for himself.' "). Similarly, in *Brown*, we found that the defendant was constructively denied his right to counsel where he "was forced into a trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate." *Brown*, 424 F.2d at 1169. In that case, the defendant and his public defender became embroiled in an irreconcilable conflict. *Id.* at 1169. Brown's repeated motions for substitution of counsel were all denied by the state trial court, which did not attempt to determine the extent of Brown's dissatisfaction or to appoint alternative counsel. *Id.* As a consequence, Brown's lawyer was unable to prepare an adequate defense. At trial, Brown's attorney offered only a perfunctory defense, and Brown did not testify in his own behalf. *Id.* Here, like *Nguyen* and *Brown*, there was a complete breakdown in the communication between Daniels and his trial counsel. Daniels was not simply being obstreperous when he refused to communicate with counsel. His distrust was understandable given that: (1) the court refused to acknowledge the public defender's conflict until close to the trial; (2) the court refused to appoint Roth as his counsel even though Daniels continued to request him and obviously trusted him; (3) after all the substitutions for which Daniels was not responsible, and with three months remaining before trial, the court appointed an inexperienced former prosecutor as lead counsel; and (4) once appointed, trial counsel did not conduct reasonable preparation—they did not seek Roth's help, nor did they obtain Daniels's medical records or any information about how he became paraplegic and the extremely poor medical treatment he received after he was erroneously arrested in 1981.

Daniels's paranoia led him particularly to distrust a lawyer who had spent most of his career as a prosecutor and whom

he thought was appointed to see that he was convicted and sentenced to death. Although Daniels's belief may have been unwarranted, the court still had an obligation to try to provide counsel that Daniels would trust. *Cf. Nguyen*, 262 F.3d at 1003 (holding that trial court should have been sensitive to cultural and linguistic barriers to communication in considering motion to substitute counsel); *Brown*, 424 F.2d at 1170.

For the guilt phase, the complete breakdown in communication meant that Jordan and Small were unable to discuss possible defense strategies with Daniels or to discover and assess basic information about the case from his perspective so that they might pursue that strategy. As a consequence, the jury never heard Daniels testify to his version of the events. Instead, defense counsel presented the implausible defense that Daniels was not the perpetrator of the murders.

The conflict between Daniels and Jordan had an even more profound effect on the penalty phase. Jordan believed that Daniels's explanation of the events from his perspective—including his fear when the officers entered his room and of returning to custody—could have formed the basis of a mitigation case. But, because Daniels mistrusted him and would not communicate with him, Jordan was hampered in his ability to develop a case of mitigation for the penalty phase through Daniels's own words. In addition, because of his paranoia, Daniels refused to cooperate with psychologist Oliver, believing their conversation was being monitored. Had Daniels cooperated, Oliver might have been able to make an evaluation that exposed Daniels's mental illness for use in mitigation. Or, Daniels may have revealed a source of information leading to mitigating evidence.

The district court's findings in this case, made after an evidentiary hearing that included testimony from Daniels's trial counsel, reflect the extent of the conflict. According to the court:

The lack of communication between Daniels and his counsel was so profound that it rendered Counsel completely unable to discover the basic information necessary to give fair consideration to how best to defend Daniels at the guilt phase . . . or to develop any meaningful mitigation at the penalty phase.

No case in which the Ninth Circuit has held that a defendant's Sixth Amendment right to counsel was violated by reason of a breakdown of communications between client and counsel has involved a more clear showing that the breakdown amounted to a constructive denial of the right to counsel itself. . . . In this case, communications did not "break down," but rather never existed. Daniels'[s] refusal to communicate was the understandable reaction of a defendant faced with the death penalty whose right to counsel had been mishandled by the trial judge from the beginning of the proceedings.

**[4]** This "serious conflict" between Daniels and his trial counsel gives rise to a presumption of prejudice. *Perry v. Leeke*, 488 U.S. 272, 278-79 (1989); *Schell*, 218 F.3d at 1027 ("In the event that the trial court determines that a serious conflict did exist that resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required; and Schell's trial shall be presumed to have been unfair."). As this district court stated, "Daniels'[s] case represents the paradigm case as to why prejudice must be presumed. . . . It is in a case presenting circumstances like these —where the breakdown in communication impeded counsel's ability to provide assistance as to the most basic considerations for a defense—that prejudice must be presumed because it is so likely to have occurred."[25] The extent of Dan-

_____

[25]The district court goes on to conclude that because Daniels did not show that other counsel was available to represent Daniels at his trial, his Sixth Amendment right to counsel was not violated as to the guilt phase

iels's conflict with trial counsel was serious and gives rise to a presumption that Daniels was prejudiced by his inability to communicate with counsel.

### 2. *Trial Court's Duty to Inquire*

When a trial court is informed of a conflict between trial counsel and a defendant, "the trial court should question the attorney or defendant 'privately and in depth,' and examine available witnesses . . . ." *Nguyen*, 262 F.3d at 1004 (quoting *Moore*, 159 F.3d at 1160). A conflict inquiry is adequate if it "ease[s] the defendant's dissatisfaction, distrust, and concern" and "provide[s] a 'sufficient basis for reaching an informed decision.' " *Adelzo-Gonzalez*, 268 F.3d at 777 (citations omitted).

Here, the state trial court never questioned Daniels or his attorneys individually after Daniels informed the court of the conflict, and did not call any witnesses on the issue. When Daniels submitted a letter detailing some of his concerns before trial, the trial court disregarded Daniels's concerns. For example, Daniels told the trial court that "there is things in this case that I feel like would be vital that the Court's be made aware of where the attorney of record do not know and have no knowledge of." As a result, Daniels wanted to question witnesses himself or have another attorney question them. Although Daniels had made it clear that he did not trust his attorneys and could not communicate with them, the trial court did not conduct any inquiry into the conflict between

of the trial. Not only is a defendant not required to establish the availability of alternative counsel, imposing such a requirement would conflict with the presumption of prejudice that is required by Ninth Circuit and Supreme Court precedent. *See Perry*, 488 U.S. at 278-79 ("Actual or constructive denial of the assistance of counsel altogether, is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." (internal citation and quotations omitted)); *Schell*, 218 F.3d at 1027.

Daniels and his counsel. Instead, the court instructed Daniels that he should discuss the matter with these same attorneys.

### 3. Timeliness of Motion

"In evaluating the timeliness of [a] motion for substitution of counsel, we balance 'the resulting inconvenience and delay against the defendant's important constitutional right to counsel of his choice.' " *Moore*, 159 F.3d at 1161 (quoting *D'Amore*, 56 F.3d at 1206). Even if the trial court becomes aware of a conflict on the eve of trial, a motion to substitute counsel is timely if the conflict is serious enough to justify the delay. *Adelzo-Gonzalez*, 268 F.3d at 780. This is particularly true where the trial court has reason to know of the conflict months before the trial but does not inquire into the conflict. *Id.*

Here, Daniels informed the trial court three months before the trial that he did not trust his appointed counsel and that trial counsel could not properly represent him. Daniels again informed the trial court of the conflict and requested substitution in a letter dated September 6, 1983, before opening statements in the guilt phase. Daniels's motion was timely under *Adelzo-Gonzalez. See* 268 F.3d at 780.

**[5]** Because of a conflict not of their making, Daniels and his counsel, Jordan and Small, were impeded in their exchange of information and advice. As the district court concluded, "[t]he lack of communication between Daniels and his counsel was so profound that it rendered counsel completely unable to discover the basic information necessary" to defend Daniels. Consequently, Jordan and Small were "understandably deprived of the power to present any adequate defense in [Daniels's] behalf." *See Brown*, 424 F.2d at 1169. The impact of this conflict infected counsel's representation of Daniels at both the guilt and penalty phases of Daniels's trial. Ultimately, this meant that Daniels was constructively denied his right to counsel in violation of the Sixth Amendment. *See*

*Strickland v. Washington*, 466 U.S. 668, 685 (1984) (noting that defendant "is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair"); *see also Brown*, 424 F.2d at 1170.

## B. *Ineffective Assistance of Counsel*

**[6]** To establish a claim for constitutionally ineffective assistance of counsel, Daniels must establish that (1) his counsel's actions were outside the range of professional conduct, and (2) that, but for counsel's error, there is a reasonable probability that the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 686. In considering whether Daniels received the reasonably effective assistance to which he was entitled, we must determine whether counsel's representation "fell below an objective standard of reasonableness." *Id*. at 686 & 688 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). To determine whether counsel's errors prejudiced the outcome of the trial, we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately. *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995).

### 1. *Counsel's Representation*

#### a. Failure to Resolve Communication Conflict

A major impediment to Jordan and Small's representation of Daniels was Daniels's mistrust of his counsel and the resulting lack of attorney-client communication. This conflict meant that Jordan was unable to effectively communicate with his client Daniels and thus, was deprived of a valuable source of information in preparing for his defense. Ultimately, a complete breakdown in communication with their client

Daniels rendered Jordan and Small's assistance ineffective. *See Frazer v. United States*, 18 F.3d 778, 782 (9th Cir. 1994) (noting that *Strickland*'s performance prong "contemplates open communication unencumbered by unnecessary impediments to the exchange of information and advice"). This is particularly true given Jordan's ineffective efforts to overcome the impasse.

The record reveals that although Jordan was aware of the effect this communication block would have on his representation of Daniels, he did little to overcome it. As Jordan conceded, the circumstances and events surrounding his representation of Daniels—including the lack of preparation on the case by the Public Defender's Office, Daniels's lack of confidence in Jordan and Small, and attorney Roth's inability to disclose information—deprived him of information that would normally be available to defense counsel.

Nevertheless, Jordan did not apprise the district court of the extent of the communication problem with his client. In addition, even though Jordan believed Daniels's best hope was to testify and explain what had occurred and why, he did not press Daniels to testify. Nor did he explain to Daniels that his testimony was critical to his defense—indeed, that it was the only valid defense strategy. Moreover, Jordan failed to explain to Daniels how his testimony during the guilt phase would benefit his penalty phase presentation. Having Daniels describe his fears and paranoia to the jury would provide context to the psychological or other mitigating evidence offered at the penalty phase.

Even more puzzling is Jordan's failure to contact attorney Roth for assistance in overcoming this problem, despite knowing that Daniels trusted and confided in Roth. Roth later testified that he had refrained from speaking with Jordan after Roth was designated a prosecution witness to avoid learning any new information from Jordan that he might be forced to reveal to the prosecution. However, Roth's concern should

not have kept Jordan from seeking information *from* Roth, as that would not have necessitated Jordan revealing any attorney-client privileged information that Roth did not already know. In addition, Jordan could have sought Roth's advice or assistance in securing Daniels's trust.

**[7]** Jordan, however, took no steps to obtain Roth's assistance in communicating with Daniels.[26] Instead, it appears that either Jordan or Small told Roth to "keep [his] hands off and let's see if we can handle this to the best of our ability." Moreover, Jordan did not attempt to use Roth during the penalty phase even though Roth was no longer a prosecution witness and the trial court had expressly suggested that Jordan contact Roth. As the district court concluded, "[i]n light of [Jordan's] admitted knowledge that Daniels'[s] testimony was critical to his defense and his ongoing inability to communicate with Daniels, his failure to use Roth in any way to overcome the communication failure, particularly by the time of the penalty phase when any threat from Roth's designation as a witness had been lifted, constituted deficient performance."

    b.   Failure to Investigate Mental Health Defenses or Mitigation Evidence

More troubling is counsel's failure to conduct a thorough investigation into Daniels's mental illness and possible brain damage. Even though Daniels refused to speak to his counsel, Jordan still had an independent duty to investigate the facts of his case and possible mitigation evidence. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) ("[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client."); *see also Birt v. Montgomery*, 709 F.2d 690, 701

---

[26]Jordan's only explanation was that he did not contact Roth because he believed that if Roth had any useful information, he would have contacted Jordan. This explanation, however, ignores the fact that it was Jordan who owed a duty of effective representation to Daniels, not Roth.

(7th Cir. 1983) ("Essential to effective representation . . . is the independent duty to investigate and prepare."); *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("At the heart of effective representation is the independent duty to investigate and prepare."); 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. . . . The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.").

**[8]** We have found counsel "ineffective where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so." *See Hendricks v. Vasquez*, 974 F.2d 1099, 1109 (9th Cir. 1992) (vacating judgment of district court where it was not possible to "determine if counsel's decision was a strategic one, and if so, whether the decision was a sufficiently informed one."). As we have explained, "[p]retrial investigation and preparation are the keys to effective representation of counsel. Courts have repeatedly stressed the importance of adequate consultation between attorney and client, the interviewing of important witnesses, and adequate investigation of potential defenses." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983) (internal citations omitted).

In *Wiggins v. Smith*, the Supreme Court concluded that Wiggins was denied effective assistance of counsel because his trial counsel failed to conduct an investigation that would have revealed a background of sexual and physical abuse, borderline mental retardation, and troubling experiences in the foster care system. 539 U.S. 510 (2003). Wiggins's trial counsel had made a minimal investigation: they had obtained reports from the Department of Social Services, had consulted a pre-sentence investigation report, and had hired a psychologist to perform some preliminary tests. Despite preliminary

findings suggesting that Wiggins had been significantly victimized as a child, his trial counsel did not conduct any additional investigation or pursue any of these leads.

In reversing the Fourth Circuit's denial of the petition, the Court explained the focus of its inquiry this way:

> [O]ur principal concern in deciding whether [Wiggins' trial counsel] exercised 'reasonable professional judgment,' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable.

*Wiggins*, 539 U.S. at 522-23 (internal citation omitted). Counsel's decision not to expand their investigation beyond the preliminary reports they had access to fell below professional standards. *Id.* at 524-25. The Court found it particularly unreasonable for counsel to limit the scope of their investigation given the preliminary reports, noting that "any reasonably competent attorney" would have pursued such leads in order to make an informed choice among possible defenses. *Id.* at 525. "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527. Using this standard, the *Wiggins* Court found that Wiggins's counsel had chosen to abandon their investigation at an unreasonable juncture, and thus had made a fully informed decision with respect to sentencing strategy "impossible." *Id.*

**[9]** Here, the record reveals that although Jordan believed Daniels may have suffered from a mental illness, he did little to investigate Daniels's mental health. Even after Dr. Banks's preliminary examination indicated a strong probability that Daniels was schizophrenic and suffered from paranoia, trial

counsel did not follow up on these important leads by seeking a comprehensive evaluation by more qualified and experienced practitioners. Given these preliminary results, counsel was expected to investigate further, rather than "abandon their investigation at an unreasonable juncture." *Wiggins*, 539 U.S. at 527-28; *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.").

Nor did counsel follow up on the evidence of Daniels's impaired mental state that was available in reports at the time he was preparing for trial. For instance, Jordan failed to review Daniels's family and social history, which described a family history of mental illness. Although many of the documents related to Daniels's social history were not collected until after he was convicted, they were *all* available at the time of Daniels's trial. Similarly, much of Daniels's medical history was available even without Daniels's cooperation as it was held by *prison* hospitals. Had counsel reviewed these records, they would have found that, even before 1982, prison psychiatrists and psychologists considered Daniels mentally ill, at risk of experiencing a psychotic episode, and in need of psychotherapy. Daniels's medical records also contained information about prescription medications he was taking at the time of the offense. Nevertheless, counsel never investigated what, if any, potential effect these medications may have had on Daniels's mental state. Counsel's failure to review readily available records held by prison officials fell below a reasonable level of performance. *See Rompilla v. Beard*, 125 S. Ct. 2456, 2464-67 (2005) ("With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation.").

Instead of seeking further mental evaluations, Daniels's counsel relied on the expert witness testimony of psychologist Banks, who was not qualified to testify in a capital case and whose testimony toyed with the idea that Daniels could be a sociopath.[27] *See Ainsworth v. Woodford*, 268 F.3d 868, 874-85 (9th Cir. 2001) ("[C]ounsel's ill-preparation resulted in the testimony of one defense witness . . . [whose testimony] contribut[ed] to the evidence in aggravation[,]" not mitigation) (hereinafter *Ainsworth II*). This alone constituted a significant error. *See Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002) ("It is significant in considering the impact of the omitted evidence on the reliability of [the defendant's] sentence, that the evidence presented by the defense as mitigation consisted primarily of lay background and character evidence. The only expert testimony presented relating to [the defendant's] mental health did not shed light on his brain damage, [but] tended, rather, to paint him as a violent psychopath."). Consequently, Daniels never received a thorough mental health examination or diagnosis, and the jury never heard any mitigating psychological explanation for Daniels's behavior.

In addition, Jordan failed to investigate or present evidence explaining Daniels's fear of returning to custody, which may have offered some explanation for his actions. Much of this fear could be based on Daniels's erroneous arrest in 1981, during which he received such inadequate medical care that he contracted urine poisoning. Evidence of this arrest and mistreatment was easily accessible in police records and in the public records of Daniels's suit filed against the County of Riverside. Counsel could have uncovered these records regardless of Daniels's cooperation.

---

[27]According to Jordan, he agreed to have Banks testify only upon Daniels's insistence. This, however, does not absolve Jordan of responsibility for the disastrous results. *See Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003) ("[A]lthough the client's desires are not to be ignored altogether, it may be inappropriate for counsel to acquiesce to the client's demands.").

**[10]** The evidence presented at the district court's evidentiary hearing suggests that if Jordan had undertaken a thorough investigation of Daniels's mental state, the jury would have heard evidence that Daniels suffered from a mental disorder at the time he committed the murders. After conducting a comprehensive review of Daniels, psychiatrist Dudley concluded that Daniels suffered a paranoid disorder at significant times prior to the shootings as well as during the shooting and later during the trial. In Dudley's opinion, a competent psychiatrist would have reached the same conclusion in 1982. Equally compelling would have been Rothenberg's testimony that Daniels suffered from brain damage, at least since the 1980 shooting. Because his counsel did not thoroughly investigate Daniels's mental history, none of this evidence was put before the jury and could not be considered in the jury's deliberations.

**[11]** Nothing in the record suggests that the failure to investigate was the result of a strategic decision. According to the district court, Jordan's "decision to delay his investigation and preparation for the penalty phase until it was essentially too late to permit the development and therefore introduction of meaningful mitigation is without explanation or justification."[28]

---

[28]The State argues that the mental health evaluations conducted by Oliver and Philips indicate that they found no evidence of mental disease or defect. Thus, according to the State, there was nothing to indicate to defense counsel that they should pursue further testing, and their failure to do so was a strategic choice. Contrary to the State's suggestion, Jordan had every reason to doubt Oliver's conclusions, as he was aware that Oliver had not been able to examine Daniels because of Daniels's refusal to cooperate. Nothing in Oliver's letter indicates that he evaluated Daniels's medical, social, educational, or criminal records or that he conducted *any* medical or psychological testing to assess Daniels's mental state. Similarly, Philips's letters contain no evidence that he conducted any testing, evaluation procedures, or structured assessment of Daniels's mental state. The only defense psychologist to even do a limited assessment of Daniels was Banks's assessment done immediately before the penalty phase. Moreover, according to Jordan, the decision not to conduct more testing was *not* based on trial strategy, but necessitated by a lack of time and adequate funding.

Jordan did request additional funds for mental health expert testimony, but not until one week before the penalty phase was to begin. Thus, when preliminary screening suggested that Daniels was both schizophrenic and brain damaged, insufficient time and funding prevented further evaluations by neuropsychology experts. Indeed, at the evidentiary hearing, Jordan testified that he was unable to pursue further mental health evidence because of funding and time limitations. It was this lack of time and funding—and not a strategic choice—that hampered Jordan's representation and ability to present mitigation evidence.

In summary, counsel (1) primarily relied on one inexperienced psychologist, who had conducted only a cursory screening of Daniels, as the principal witness in mitigation; (2) failed to follow up when this preliminary screening suggested that Daniels suffered from a mental disorder; (3) failed to follow up on evidence of paranoia; (4) failed to review Daniels's family and social history which described a family history of mental illness; (5) failed to investigate whether the medication prescribed for Daniels impacted his state of mind at the time of the shootings; and (6) failed to investigate Daniels's use of illegal substances, in particular, the combined impact of these with the prescription medications on his state of mind.

**[12]** More importantly, counsel's failures were not the result of strategic decision-making, but of a communication breakdown with their client, the court's refusal to grant a continuance, a shortage of time, and repeated problems with securing state funding. As *Wiggins* makes clear, without a reasonable investigation, a fully-informed decision with respect to trial strategy is "impossible." *Wiggins*, 539 U.S. at 527-28. Because the failure to conduct a reasonable investigation lacked a strategic rationale, Daniels's representation was ineffective. *See Hendricks*, 974 F.2d at 1109; *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding that counsel had an obligation to conduct a thorough investigation of the defen-

dant's background); *see also Strickland*, 466 U.S. at 691 (finding that counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary").

### 2.   *Prejudice*

Next we must consider whether Daniels was prejudiced by this deficient performance, that is, whether there is a reasonable probability that, but for his counsel's errors, the jury would have reached a different conclusion. *See Avila v. Galaza*, 297 F.3d 911, 921 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 695). A " 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

#### a.   Guilt Phase

It is clear in this case that Daniels shot the two officers and is guilty of some type of unlawful killing. However, as demonstrated during the evidentiary hearing, there was evidence that his mental state at the time of the offense could have been used as a defense to first degree murder.

**[13]** A defendant suffers prejudice when counsel's ineffective performance leads to an increased sentence for the defendant. *Glover v. United States*, 531 U.S. 198, 202-05 (2001). We have repeatedly held that defense counsel in a murder trial was ineffective where there was some evidence of the defendant's mental illness in the record, but counsel failed to investigate it as a basis for a mental defense to first degree murder. *See Jennings v. Woodford*, 290 F.3d 1006, 1010, 1014-16 (9th Cir. 2002) (holding that where "trial counsel failed adequately to investigate and present considerable evidence regarding petitioner's psychological and family history that might have . . . defeated the jury's finding of the requisite intent for first degree murder in the guilt phase," defendant was denied effective assistance of counsel); *Seidel v. Merkle*, 146 F.3d

750, 755-56 (9th Cir. 1998) (reasoning that counsel was prejudicially ineffective for failing to conduct reasonable investigation of guilt phase mental defenses where there was evidence in record that defendant had previous psychiatric treatment in jail); *Bloom v. Calderon*, 132 F.3d 1267, 1277 (9th Cir. 1997) ("The complete lack of effort by Bloom's trial counsel to obtain a psychiatric expert until days before trial, combined with counsel's failure to adequately prepare his expert and then present him as a trial witness, was constitutionally deficient performance."); *see also Sanders*, 21 F.3d at 1456 (holding that trial counsel was deficient during guilt phase for "fail[ing] to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer," and that "[d]escribing [counsel]'s conduct as 'strategic' strips that term of all substance"). This is particularly true where the defense that was presented at trial was weak or meritless. *See, e.g.*, *Jennings*, 290 F.3d at 1016 ("[A] possible conflict between a diminished capacity and an alibi defense would not excuse counsel's failure initially to investigate the potential strengths of a 'mental defense' vis-a-vis an uncorroborated alibi defense.") (quoting *People v. Mozingo*, 671 P.2d 363, 367 (Cal. 1983)).

**[14]** Prison psychiatrists diagnosed Daniels as schizophrenic as early as 1965, but the only psychiatrist who spoke with Daniels before the trial did not review any of Daniels's medical records and was only able to conduct a cursory examination. There was no evidence presented at trial of Daniels's mental illness or brain damage, nor of his fear of returning to prison. Instead, counsel presented a defense that went against all the weight of evidence, i.e., that Daniels was not the perpetrator. As the district court concluded, "even in the face of his inability to communicate with Daniels, selecting such a strategy was ineffectual and in fact was indefensible." *See Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002) ("Certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective." (quoting *United States v. Tucker*, 716 F.2d 576, 586 (9th Cir.

1983))). More important, this defense deprived Daniels of the opportunity to challenge the prosecution's theory that he acted with premeditation and denied him two available mental health defenses that, under California law, may have reduced his conviction from first to second degree murder, thereby making him ineligible for the death penalty. *See* Cal. Penal Code § 190.2(a) (noting that defendant must be convicted of first degree murder to be sentenced to death).

First, evidence regarding Daniels's mental illness may have demonstrated that Daniels was incapable of forming the requisite intent to commit first degree murder. California's diminished capacity defense provides that a defendant can be legally sane at the time of the murders, but "if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree."[29] *People v. Cruz,* 605 P.2d 830, 834 (Cal. 1980). If there was evidence that a mental illness prevented the defendant from "maturely and meaningfully reflect[ing] upon the gravity of his contemplated act," then the defendant would not be guilty of first degree murder despite "[s]ubstantial evidence supporting a finding of premeditation and deliberation." *Id.* at 835 (quoting *People v. Wolff,* 394 P.2d 959, 975 (Cal. 1964)).

Here, there is evidence that Daniels suffered from severe mental illness and possible brain damage. Under the diminished capacity standard, a jury could well have found that he did not have the capacity to truly premeditate and understand the gravity of shooting at the officers who were coming to take him to prison. *See People v. Ledesma*, 729 P.2d 839,

---

[29]California abolished the diminished capacity defense in June 1982. However, the California Supreme Court has held that for crimes that took place before June 1982, the defense is still available, and trial counsel can be held to be ineffective if they did not pursue the defense where it was warranted. *People v. Weaver*, 29 P.3d 103, 130, 130 n.8 (Cal. 2001). Daniels killed the police officers in May 1982, and therefore the diminished capacity defense was still available to him at the time of his trial.

872-73 (Cal. 1987) (holding that counsel was prejudicially ineffective for failure to investigate mental illness evidence despite expert's report stating that defendant was competent to stand trial because report raised other issues); *People v. Mozingo*, 671 P.2d 363, 367-68 (Cal. 1983) (holding trial counsel ineffective for failure to investigate diminished capacity defense despite defendant's unwillingness to cooperate where he previously had been diagnosed with schizophrenia by prison psychologist during previous incarceration); *People v. Frierson*, 599 P.2d 587, 596-97 (Cal. 1979) (holding that even though defendant was rational and appeared to be without mental abnormalities, and even though killings appeared to be deliberate, counsel was prejudicially ineffective for failing to investigate evidence that defendant was impaired on day of murders); *People v. Corona*, 145 Cal. Rptr. 894 (Ct. App. 1978) ("[T]rial counsel in gross neglect of his basic duty, failed to conduct the requisite factual and legal investigation in an effort to develop [a diminished capacity defense] and as a result of his neglect, [this] crucial defense [was] withdrawn from the case."); *In re Hwamei*, 112 Cal. Rptr. 464, 469 (Ct. App. 1974) (holding that where there were some indications on record that defendant may have had mental illness, counsel was prejudicially ineffective for not investigating and pursuing diminished capacity defense, and instead presenting mistaken identity defense where facts did not support it).

Evidence of Daniels's mental illness may also have demonstrated imperfect self-defense. A defendant can be convicted of second degree rather than first degree murder if he subjectively experienced heat of passion or provocation at the time of the murder, such that it negated deliberation or premeditation. *People v. Fitzpatrick*, 963 Cal. Rptr. 2d 808, 814-15 (Ct. App. 1992). This defense applies even if the defendant's subjective belief was unreasonable. *See People v. Padilla*, 126 Cal. Rptr. 2d 889, 892-93 (Ct. App. 2002) (holding defendant entitled to argue provocation as defense to first degree murder where he killed his cellmate after hallucinating that cellmate

had killed defendant's family, even though it was objectively unreasonable to believe that cellmate killed his family).

"Imperfect self-defense obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." *People v. Rios*, 2 P.3d 1066, 1074 (Cal. 2000). A defendant who killed with a subjective but unreasonable belief that he is going to be killed or seriously harmed is not guilty of first degree murder. *Id.*

Daniels may have believed that officers Doty and Trust were coming to kill or seriously harm him. This is objectively unreasonable, but there are several indications that it may be what Daniels actually thought. First, diagnoses of Daniels's mental condition support this conclusion. Oliver stated that Daniels exhibited a degree of paranoid ideation. Dudley later assessed that Daniels had a delusional disorder, and that Daniels remained delusional for "some time" surrounding the murders and the trial. Second, Daniels had previously been shot by the police nine times, arrested erroneously, betrayed by his own attorney, and subjected to insufficient and harmful medical treatment in jail that resulted in urine poisoning. Presenting evidence that Daniels was paranoid delusional and feared for his life or safety when the officers came to arrest him could have created a reasonable doubt in the minds of the jurors as to whether Daniels premeditated or deliberated these killings.

**[15]** Because he did not overcome the communication failure, Jordan failed to learn Daniels's version of the shooting and failed to advise Daniels regarding his possible testimony. Exacerbating this, Jordan also failed to adequately investigate Daniels's mental health and background. Because of counsel's deficient performance, Daniels was denied the opportunity to rebut the State's theory that he acted with premeditation and malice in shooting officers Doty and Trust,

opening the possibility of a verdict on less than first degree murder.

### b.   Penalty Phase

**[16]** In the penalty phase of a capital trial, "[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1998). This is necessary because "[t]he determination of whether to impose a death sentence is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, to weigh the worth of one's life against his culpability." *Id.* (quoting *Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir. 1995)).

Here, Jordan's failure to overcome the communication problems and failure to investigate meant that the jury did not have before it all the possible evidence of mitigation when it deliberated Daniels's sentence. If he had done more to overcome the communication problem, Jordan may have prevailed upon Daniels to testify regarding his fear of returning to custody. In addition, post-conviction evaluations of Daniels revealed that he likely suffered from brain damage or a mental disorder at the time of the murders of Doty and Trust. If his counsel had been able to communicate with him, such evidence may have come to light earlier and been available to the jury in its deliberations.

Moreover, Jordan made no reasonable attempt to work around Daniels's refusal to speak with him. Even if Daniels had never spoken with his counsel, possible mitigating evidence was still available to Jordan, if he had undertaken an independent investigation. For instance, a review of Daniels's prison medical records would have revealed that prison psychiatrists and psychologists considered Daniels mentally ill and in need of psychotherapy. A review of Daniels's social

history would have shown that Daniels's family had a history of mental illness. Finally, the records of Daniels's wrongful arrest in 1981, including the records of his suit for damages, contained information about the effects of that mistreatment, which may have been used to explain his fear of returning to custody. Jordan's failure to investigate and present this evidence deprived the jury of possible mitigating evidence that did not depend on Daniels's cooperation or communication.

The jury deliberated for two days before returning a verdict of death. This suggests that the jury may have been influenced by mitigation evidence had it been offered. Instead, the only mitigating evidence presented was the testimony of Banks, who was woefully unprepared and who suggested Daniels may be a sociopath. This alone is sufficient for a finding of prejudice. *See Caro v. Woodford*, 280 F.3d at 1257.

**[17]** In addition to a deficient penalty phase representation, Daniels was likely prejudiced by Jordan's guilt phase defense that claimed Daniels was not the shooter. As a result, Daniels faced a jury that could only be profoundly annoyed by this ludicrous defense in the face of overwhelming evidence of culpability. Thus, Daniels appeared before the sentencing jury as a man charged with murder to evade arrest, implausibly arguing that he was not the shooter to evade justice. The combination of counsel's guilt and penalty phase deficiencies, including their failure to investigate their client's mental health and failure to overcome a complete communication failure, combined to deny Daniels effective representation and prejudiced the outcome of his penalty phase trial. *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) ("[P]rejudice may result from the cumulative impact of multiple deficiencies.").While the trial court's refusal to grant a continuance hampered Daniels's penalty phase presentation, Jordan's failure to investigate, to seek funding for mental health expert testimony until a week before the penalty phase began, or to otherwise prepare for this stage of the trial, clearly prejudiced Daniels. As a consequence, the jury considering Daniels's

sentence was never exposed to meaningful mitigation evidence that may have meant the difference between a life or death sentence.

## II.  Due Process

### A.  *Change of Venue*

In light of the extensive pretrial publicity surrounding the murders of the two police officers, Daniels's defense counsel moved for a change of venue and for funds to conduct a community survey to demonstrate the impact of this publicity on the community. In denying the motions, the trial court took the position that whether an impartial jury could be empaneled would be determined by the outcome of the voir dire process. Daniels twice renewed the motion, once during voir dire and again after voir dire. The trial court denied each of the motions.

**[18]** "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (citing *In re Oliver*, 333 U.S. 257 (1948)). Because a criminal defendant has the right to an impartial jury, a court must grant a motion to change venue "if prejudicial pretrial publicity makes it impossible to seat an impartial jury." *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998), *as amended,* 152 F.3d 1223 (citations and internal quotations omitted) ("*Ainsworth I*"). When "sitting in habeas corpus [the duty of the federal court] is to make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible." *Harris v. Pulley*, 885 F.2d 1354, 1360 (9th Cir. 1988) (quoting *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984)). Thus, the reviewing federal court must conduct an independent review of news reports about the case. *Id.*

Here, the district court was unable to make an independent review of the pre-trial publicity because the news coverage was not included in the record. It is also not included in the appellate record before us. Like the district court, we rely on the findings of the California Supreme Court regarding publicity.

**[19]** To support a change of venue motion, Daniels must demonstrate either actual or presumed prejudice. *Id*. To demonstrate actual prejudice, Daniels must show that "the jurors demonstrated actual partiality or hostility that could not be laid aside." *Id*. at 1363. Here, Daniels concedes that the record contains no findings that any jurors demonstrated partiality or prejudice that could not be laid aside. Thus, to prevail, Daniels must make a showing sufficient for a presumption of prejudice. Prejudice is presumed only in extreme instances "when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Ainsworth I*, 138 F.3d at 795.

Three factors should be considered in determining presumed prejudice: (1) whether there was a "barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion"; (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial. *Id.* (citations omitted).

Applied here, these factors compel a finding "that the venue [wa]s saturated with prejudicial and inflammatory media publicity about the crime" sufficient for a presumption of prejudice. *See id.* at 795. The murders of Doty and Trust generated extensive and nearly continuous publicity immediately after the shootings and again before Daniels's trial. *See Daniels*, 802 P.2d at 919. Articles described SWAT team searches of the neighborhood where Daniels was hiding. *Id.*

News accounts described the perpetrator as a Black paraplegic, and Daniels was identified in press accounts as the killer from the very beginning. *Id.*

Although the publicity diminished after Daniels's arrest, it resumed as trial approached. Three months before the trial, news articles covered the local school board's proposal to rename its football stadium in honor of officer Doty. *Id.* One month before Daniels's trial was to begin, on the anniversary of the killings, a statue commemorating fallen police officers was unveiled by the county. *Id.* The publicity surrounding the memorial and its unveiling ceremony largely referred to officers Trust and Doty. *Id.* The memorial statue, standing nine feet tall, was located across the street from the Riverside County courthouse where Daniels was tried.[30] *Id.*

Based on our review of the California Supreme Court's findings, the public's response to this publicity clearly amounted to a "huge" wave of public passion. As the California Supreme Court described it, police stations were "deluged" with calls from citizens offering tips on the investigation and offering to establish a memorial fund. *Id.* at 920. In addition, local newspapers printed numerous letters from readers calling for Daniels's execution. *Id.* The officers were turned into "posthumous celebrities," and approximately three thousand people attended their funerals. *Id.* That the news coverage saturated the county is reflected in the fact that eighty-seven percent of the jury pool recognized the case from the media coverage. *Id.* Two-thirds of those empaneled remembered the case from the press accounts—some recalled that the suspect was a Black paraplegic, others recalled that police officers were shot, and two jurors remembered Daniels by name. *Id.*

---

[30]In closing argument, the prosecution referred to this monument, saying, "The monuments that we build to these people are appropriate, 'Lest we forget.' "

The press accounts did not merely relate factual details, but included editorials and letters to the editor calling for Daniels's execution. *Id.* at 919-20. In addition, news articles reflected the prosecution's theory of the case by attributing the killings to Daniels's desire to escape justice. *See id.* at 919. Also well-publicized by the press was Daniels's past criminal offenses, including an arrest for shooting at a police officer. *Id.* Such information was highly prejudicial and would not have been admissible at the guilt phase of Daniels's trial. *Id.*

**[20]** The nature and extent of the pre-trial publicity, paired with the fact that the majority of actual and potential jurors remembered the pretrial publicity warranted a change of venue. The trial court's denial of this motion for change of venue violated Daniels's right to a fair and impartial jury and thus, his right to due process.[31]

## B. *Overlapping Special Circumstances*

Daniels also challenges the jury instructions given in the penalty phase. He argues that the trial court should have instructed the jury not to "double count" the multiple-murder special circumstance as to both murders. Specifically, the jury in Daniels's trial found to be true the special circumstance that Daniels had been convicted of killing more than one individual. *See* Cal. Penal Code § 190.2(a)(3). But the jury double counted by making this finding twice: once for each officer killed. The court neglected to instruct the jury that it could only consider the multiple-murder special circumstance as a single factor in aggravation. Daniels contends that the trial court erred in allowing this double counting, basing his argument on the plurality opinion of the California Supreme Court in *People v. Harris*, 679 P.2d 433 (Cal. 1984).

---

[31]While the same publicity that tainted the penalty phase would also have infected the guilt phase, Daniels does not raise this argument on appeal, limiting our analysis to the penalty phase only.

On Daniels's direct appeal, the California Supreme Court found the jury's finding of two multiple-murder special circumstances erroneous and set the second finding aside. *Daniels*, 802 P.2d at 938. Citing *People v. Harris*, the court held that because one finding of a multiple murder special circumstance was sufficient to establish that Daniels was "convicted of more than one offense of murder," the second such finding was erroneous.[32] *Id.* The jury, therefore, should have considered only one multiple murder circumstance at the penalty phase. *See id.*; *see also Harris*, 679 P.2d at 452 ("Since there must be more than one murder to allege this special circumstance at all, alleging two special circumstances for a double murder improperly inflates the risk that the jury will arbitrarily impose the death penalty, a result also inconsistent with the constitutional requirement that the capital sentencing procedure guide and focus the jury's objective consideration of the particularized circumstances of the offense and the individual offender.") (citing *Jurek v. Texas*, 428 U.S. 262, 273-74 (1976)). Nevertheless, the California court concluded that any error was harmless.[33] *Id.*

Similarly, the district court found that the jury was instructed to weigh the aggravating and mitigating factors in its deliberations, but not to count and compare aggravating

---

[32]In its plurality opinion in *Harris*, the California Supreme Court stated that "[b]ecause the jury is directed to take into account the existence of any special circumstances found to be true, the constitutionally mandated objective of focusing on the particularized circumstances of the crime and the defendant is undercut when the defendant's conduct is artificially inflated by the multiple charging of overlapping special circumstances or multiple special circumstances based on an indivisible course of conduct having one principal criminal purpose." *Harris*, 679 P.2d at 449. Thus, in "those cases involving a single act or an indivisible course of conduct with one principal criminal objective, the jury should be instructed that although it found several special circumstances to be true, for purposes of determining the penalty to be imposed, the multiple special circumstances should be considered as one." *Id.* at 452.B

[33]A state court's conclusion that a constitutional error was harmless is reviewed de novo. *Ghent*, 279 F.3d at 1126.

and mitigating factors. Despite this, the district court concluded that this erroneous "double counting" did not result in prejudice warranting reversal. In rejecting Daniels's argument, the court relied on *Williams v. Calderon*, 52 F.3d 1465 (9th Cir. 1995). In *Williams*, the petitioner was convicted under the 1977 death penalty statute, and we conducted a harmless-error analysis based on the structure of that statute, which we concluded was a "nonweighing" statute. *See id.* at 1475-80. By contrast, Daniels was prosecuted under the 1978 version of the California death penalty statute,[34] which the *Williams* court found to be, "undoubtedly," a weighing regime. *Id.* at 1477.[35]

Although the differences between the two statutes are subtle, they are critically important when addressing the harmlessness question. *See id.* at 1477. Under both statutes, a jury must find at least one special circumstance to be true for the defendant to become "death-eligible." *See id.* Under the 1977 statute, however, once the jury had made that determination, it had unfettered discretion to impose the death penalty. *Id.* at 1479 (citing *People v. Boyd*, 700 P.2d 782 (Cal. 1985)). The statute simply required the jury to "consider, take into account and be guided by the aggravating and mitigating circumstances" listed in the statute. *Id.* Under the 1977 statute, the "improper label" of an invalid special circumstance would not prejudice the defendant because the jury could still consider the facts underlying the circumstance and because the jury was not instructed on how it must apply the aggravating and mitigating factors. *Id.* at 1479-80.

---

[34]The 1978 death penalty statute went into effect in November 1978. *See Williams*, 52 F.3d at 1471 n.6. The crime that underlies Daniels's conviction occurred on May 13, 1982.

[35]The statement by the *Williams* court was dicta and, therefore, the question of whether the 1978 statute is a weighing statute is still open in this Circuit. *See Morales v. Woodford*, 336 F.3d 1136, 1147 (9th Cir. 2003) (assuming, without deciding, that 1978 statute instituted a "weighing" regime). Nonetheless, the structure of the 1978 statute, as explained below, strongly indicates that it creates a "weighing" regime.

In contrast, the 1978 statute instructs the jury to "weigh" aggravating and mitigating circumstances, and *requires* them to impose the death penalty if they find that the aggravating circumstances outweigh any mitigating factors. *See* Cal. Penal Code § 190.3 ("[T]he trier of fact . . . *shall* impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances." (emphasis added)). Under the 1978 statute, the presence of an invalid aggravating circumstance—such as an invalid multiple-murder special circumstance[36]—is no longer simply an *improper label*, but becomes an additional consideration impermissibly pushing the jury towards a death sentence.

Given the differences between the 1977 and 1978 statutes, *Williams* does not control our analysis here. Rather, we find that the "double counting" error was not harmless.[37] As the Supreme Court has noted, "when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." *Stringer v. Black*, 503 U.S. 222, 232 (1992).

**[21]** When coupled with other penalty phase errors—such as the court's refusal to change venue, its decision to remove Roth as counsel, and its appointment of inexperienced counsel

---

[36]California Penal Code section 190.3 requires that, in its sentencing decision, the trier of fact consider "the existence of any special circumstances found to be true pursuant to Section 190.1." While the statute does not label the special circumstances "aggravating factors," it is beyond question that they serve that purpose.

[37]Further, the "weighing" nature of the 1978 statute reinforces Daniels's Sixth Amendment penalty phase claims. The fact that the jury was confronted with substantial aggravating circumstances and was then told that it *must* return a death sentence if it found those circumstances to outweigh the mitigating factors illustrates that Daniels's only chance was a strong penalty-phase defense. These facts strengthen Daniels's contention that he was prejudiced by the weak presentation made by defense counsel during the penalty phase that Daniels was not the shooter.

—the court's failure to instruct the jury that it could not double count the multiple-murder special circumstance gave the jury one more improper reason to tip the scales against Daniels. We agree with the district court that the cumulative effect of the these errors "so infected the[ proceedings] with unfairness as to make the death sentence invalid." As we pointed out in *Thomas v. Hubbard*, 273 F.3d 1164 (9th Cir. 2001), "[i]n analyzing prejudice in a case in which it is questionable whether any single trial error examined in isolation is sufficiently prejudicial to warrant reversal, this court has recognized the importance of considering the cumulative effect of multiple errors and not simply conducting a balkanized, issue-by-issue harmless error review." *Id.* at 1178 (internal quotations omitted) (citing *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)); *see also Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (noting that cumulative error applies on habeas review); *Matlock v. Rose*, 731 F.2d 1236, 1244 (6th Cir. 1984) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

## CONCLUSION

**[22]** Because Daniels was denied his Sixth Amendment right to counsel at both the guilt and penalty phases of his trial, we **REVERSE** the district court's denial of his petition as to the guilt phase of his trial, and **AFFIRM** as to the penalty phase.